

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 12, 2024**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| JOHN B. BOYD, *aka* BRAD BOYD, | § | |
| *dba* JEFE BULLS, LLC, *dba* JEFE | § | |
| LIVESTOCK, LLC, *dba* ERATH IRON | § | |
| AND METAL INC., *dba* ERATH IRON | § | |
| AND METAL RE, INC., *dba* JEFE LAND | § | Case No. 17-40426-ELM |
| MANAGEMENT LLC, *dba* 5 STAR | § | |
| RECYCLING, LLC, *dba* EIM | § | |
| OPERATIONS, LLC, *dba* EIM | § | Chapter 7 |
| AVIATION, LLC, *dba* EIM EXPRESS, | § | |
| LLC, *dba* LA TIERRA DE LOS | § | |
| VAQUEROS LLC, *dba* BOYD AND | § | |
| FLOYD BULLS, LLC, *dba* COUNTY | § | |
| GRUB CLUB INC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| COLEMAN COUNTY STATE BANK, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 17-04089 |
| | § | |
| JOHN BRADLEY "BRAD" BOYD, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Coleman County State Bank (the "**Coleman**") has brought this action against Defendant John Bradley "Brad" Boyd, the chapter 7 debtor in Case No. 17-40426 (the "**Bankruptcy Case**"), to seek a determination of the amount of debt allegedly owed by Mr. Boyd to Coleman under a prepetition loan guaranty executed by Mr. Boyd and to also object to the granting of a chapter 7 bankruptcy discharge to Mr. Boyd or, alternatively, to the granting of a discharge to Mr. Boyd with respect to the guaranteed debt owed to Coleman.  While Mr. Boyd acknowledges that he is liable to Coleman on the guaranty, he disputes each of the discharge objections.

The Court conducted a six-day trial of the matter.  Having now considered Coleman's Complaint,[1] Mr. Boyd's Answer,[2] the parties' joint factual stipulations,[3] the parties' respective other pretrial submissions,[4] the evidence introduced at trial,[5] including the parties' designated deposition excerpts,[6] the arguments of counsel, and Mr. Boyd's post-trial brief,[7] the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[8]

---

[1] *See* Docket No. 80 (Second Amended Complaint, referred to herein as the "**Complaint**").

[2] While Mr. Boyd timely answered Coleman's First Amended Complaint filed at Docket No. 19 (the "**Original Complaint**"), *see* Docket No. 29 (the "**Answer**"), he never answered the current live Complaint.  Nevertheless, to the extent the factual allegations of the current live Complaint mirror the factual allegations of the Original Complaint, the Court will treat the Answer as responsive to the current live Complaint as well.

[3] *See* Docket No. 82, ¶¶ B-1 to B-10 (the "**Stipulations**").

[4] *See* Docket Nos. 77-79.

[5] To simplify exhibit management at trial, the parties coordinated on the designation and submission of a consolidated set of trial exhibits.  Thus, all joint trial exhibit references herein use the convention "Jt. Tr. Exh. ___."

[6] *See* Docket Nos. 91-94.

[7] *See* Docket No. 95.

[8] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

### *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).  Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409.  The proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B),(I),(J) and (O).

### *FACTUAL BACKGROUND*

Mr. Boyd is a longtime Texas resident.  After graduating from high school, he attended Tarleton State University where he pursued a degree in agriculture and ranch management.  While in college, Mr. Boyd met his now-estranged wife, Nicolle Boyd, who was also a student at Tarleton State University.  In 1994, they were married.

While still in school, Mr. Boyd began working at a scrapyard in Stephenville, Texas owned by Ronnie Smith.  While Mrs. Boyd went on to obtain her undergraduate and MBA degrees from Tarleton State University, Mr. Boyd dropped out of college after his junior year to work full-time with Mr. Smith.  Mr. Boyd also began to pursue ranching operations, raising some cattle and horses.

### A.     *The Boyds Organize Erath Iron to Acquire the Stephenville Scrapyard*

In 2000, the Boyds entered into an agreement with Mr. Smith to acquire the Stephenville scrapyard, a scrapyard that dealt in both ferrous and nonferrous metals.  The Boyds organized Erath Iron & Metal, Inc. ("**Erath Iron**") to own the business.  According to Mr. Boyd at trial, Mr. Boyd was issued 49% of the stock of Erath Iron and Mrs. Boyd was issued the remaining 51% of the stock.  As the sole shareholders of Erath Iron, the Boyds appointed themselves as the sole directors of the company and appointed Mrs. Boyd to serve as the President and Mr. Boyd to serve as the Secretary.

Generally, Erath Iron would buy scrap metal from the public at large and then process it, selling the refined product to metal mills. From the beginning, Mr. Boyd worked full-time at the scrapyard and managed all of the scrapyard operations, including the purchasing of inventory and oversight of the scrapyard managers. Early on, Mrs. Boyd only worked part time, having a separate job elsewhere. Later, however, Mrs. Boyd also worked full-time at Erath Iron and oversaw the financial and back-office operations of the business, including management of the accounting, bookkeeping, and administrative staff. Irrespective of their titles and division of responsibility, at all relevant times the Boyds considered Mr. Boyd to be the one in charge of the company and he had the final say on all material decisions.

**B.     *Erath Iron's Expansion***

In 2003 or 2004, after enjoying several years of success, the Boyds expanded Erath Iron's footprint with the acquisition of a satellite scrapyard in Eastland, Texas. Later, in or about 2007, Gary Martin, the owner RJ Machine, a holding company that was also involved in the scrap metal business through certain of its subsidiaries, approached Mr. Boyd with an interest in acquiring the Eastland scrapyard. Mr. Martin had been in the process of expanding his own network of metal scrapyards and first became aware of Mr. Boyd when Erath Iron acquired some metal cable from one of Mr. Martin's companies.

Initially, Mr. Boyd expressed no interest in selling the Eastland yard. But when commodity prices fell in or about 2008 or 2009, Mr. Boyd's position softened and he came up with a win-win scenario whereby, in conjunction with agreeing to sell the Eastland scrapyard to Mr. Martin, Mr. Boyd would obtain Mr. Martin's assistance in the Boyds' acquisition of a shredder – a large, heavy piece of equipment used to process and refine recyclable bulk items, such as home appliances and vehicles. Having a shredder would enable Erath Iron to increase the volume of its scrap processing and carve out a niche within the Texas scrap market, as there were few others operating shredders

in the area at that time.  The Boyds used one of their companies, EIM Operations, LLC ("**EIM Operations**"), to acquire the shredder and financed the acquisition with a $1 million loan provided by Mr. Martin and a $3-5 million loan obtained from First Financial Bank, co-signed by Mr. Martin.

Mr. Martin was equally impressed with the increase in capacity enabled by the shredder and later decided to acquire his own shredder.  This upset Mr. Boyd who had become accustomed to viewing Mr. Martin as a mentor, as opposed to a competitor.  To avoid conflict and appease Mr. Boyd, Mr. Martin agreed to, instead, step out of his way and, in fact, sell his network of scrapyards to Erath Iron, assisting the Boyds in lining up the necessary financing for the deal.  Accordingly, with Mr. Martin's assistance Erath Iron acquired Mr. Martin's Big Spring, Eastland, Mineral Wells, and Weatherford, Texas scrapyards with financing provided by Breckenridge National Bank and Mr. Martin's agreement to serve as a guarantor on the loan for one year.  Having satellite feeder yards in smaller communities presented Erath Iron with the opportunity to acquire lower cost scrap metal that could then be processed through the shredder at Erath Iron's main Stephenville location.

Over time, Erath Iron would end up having satellite scrapyards at Alvarado, Big Spring, Breckenridge, Cross Plains, Eastland, Mineral Wells, and Weatherford, Texas.  In conjunction with its operations, Erath Iron also successfully obtained a $500,000 - $750,000 line of credit from First Financial Bank.

## C.    *The Boyds Expand Their Business Empire*

As Erath Iron's revenues increased, so did the Boyd's business empire.  By 2005 or 2006, Mr. Boyd had begun raising bucking bulls for professional bull riding and between 2005 and 2007, the Boyds acquired additional tracts of land for their ranching operations.  By 2009 or 2010, Mr.

Boyd began to travel to Las Vegas on an annual basis to have his bulls compete in the PBR (Professional Bull Riders) World Finals.

Ultimately, by the end of 2010, in addition to Erath Iron, EIM Operations, and Erath Iron & Metal RE LLC – all connected to the recycling business – the Boyds had organized the following additional entities to engage in the ranching and bull raising business: Jefe Land, Ltd.; Jefe Livestock, LLC; Jefe Bulls, LLC; Boyd & Floyd Bulls, LLC; and Jefe Management, LLC.[9]  The equity of each of these additional companies was held 50/50 by the Boyds.

While the Boyds were careful to organize individual entities to own their different business interests and assets, they were not as careful when it came to accounting for intercompany transfers.  Generally, whenever one of the smaller businesses was in need of cash, for example, the Boyds would look to the crown jewel of their business enterprise – Erath Iron – to fund the cash needs.  Along those lines, to fund costs of travel to Las Vegas for bull riding competitions, Mr. Boyd would regularly sell catalytic converters removed from scrap cars acquired by Erath Iron, using the sales proceeds for the Las Vegas trips instead of for Erath Iron purposes.

### D.    The Banking Relationship Moves to Coleman

In or around 2010, the First Financial Bank line of credit was both refinanced by American State Bank and increased to $4 million.[10]  Mark Powell served as Erath Iron's loan officer at American State Bank.  In early to mid-2011, Mr. Powell left American State Bank to join Coleman.  In connection with the move, Mr. Powell convinced both Reave Scott, President and CEO of Coleman, and Mr. Boyd to move the Erath Iron lending relationship to Coleman.

---

[9] *See* Jt. Tr. Exh. 124 (balance sheet of the Boyds as of 12/31/2010); *see also* Jt. Tr. Exh. 15 (organizational documents for the entities).

[10] *See* Jt. Tr. Exh. 68 (line 4.1 – reflecting maximum availability of $4 million under the line of credit).

As a result, first, on or about June 20, 2011, Erath Iron obtained a $1,496,283.50 loan (the "**Real Estate Loan**") to refinance its existing real estate loan. Under the terms of the new Real Estate Loan, Erath Iron was obligated to make monthly principal and interest payments to Coleman over a period of five years with a final maturity of June 20, 2016.[11] Second, on or about August 31, 2011, Erath Iron obtained a new line of credit of up to $5 million (the "**Line of Credit**") to refinance the existing line with American State Bank and provide additional working capital.[12] The new Coleman Line of Credit was subject to renewal on an annual basis. Coleman collateralized the loans with liens on substantially all of Erath Iron's assets and the Boyds guaranteed each of the loans.[13]

While Erath Iron's lending relationship was solely with Coleman, Coleman separately entered into a participation agreement with AimBank, West Texas State Bank, Gruver State Bank, and Arrowhead Bank to spread some of the risk. Consequently, while Erath Iron would work directly with Coleman on renewals, extensions, and other material modifications to the loans, Coleman would be obligated to obtain bank group approval for such renewals, extensions, and modifications. The Boyds were aware of Coleman's relationship with the other bank group members.

With respect to availability under the Line of Credit, Coleman used the same borrowing base formula and reporting/certification process that Mr. Powell had utilized at American State Bank.[14] As such, Coleman was required to submit signed borrowing base reports/certificates to

---

[11] *See* Jt. Tr. Exh. 6.

[12] Loan documents for the original line of credit were not introduced into evidence. However, other relevant loan documents (*e.g.*, Mr. Boyd's guaranty and an initial borrowing base certificate) reference the date, amount, and maturity of the original Line of Credit. *See* Jt. Tr. Exh. 10, at p.3 (guaranty of 2011 Line of Credit); Jt. Tr. Exh. 69 (8/2011 borrowing base certificate).

[13] *See* Jt. Tr. Exh. 10, at pp.1-4 (guaranty agreements executed by Mr. Boyd).

[14] *Compare, e.g.*, Jt. Tr. Exh. 68 (6/2011 borrowing base certificate) *to* Jt. Tr. Exh. 69 (Coleman 8/2011 borrowing base certificate).

Coleman on a monthly basis ("**BBCs**") and availability under the Line of Credit was determined in accordance with the following formula:

> (a) the _lesser_ of:
>
>> (i) the maximum amount of the line ($5 million under the original Line of Credit) and
>>
>> (ii) the sum of (x) a percentage (the "**Applicable A/R Percentage**") (75% under the original Line of Credit) of outstanding eligible accounts receivable _plus_ (y) a percentage (the "**Applicable Inventory Percentage**") (50% under the original Line of Credit) of the estimated value of inventory (_i.e._, scrap metal), at cost, subject to a cap (the "**Inventory Cap**") ($3 million under the original Line of Credit),
>
> _less_
>
> (b) the total amount of the loan then-outstanding.[15]

Within each BBC, Erath Iron was also required to report on the then-estimated fair market value of all inventory, broken down into different categories of metal (_e.g._, steel, aluminum, copper, alloys, zurik),[16] and to provide detail with respect to the eligible receivables relied upon in the borrowing base calculation.[17]

### E. Completion of the BBCs and Erath Iron's Financial Record-Keeping

As the officer who managed the financial and back-office operations of Erath Iron, Mrs. Boyd physically prepared, signed, and transmitted the monthly BBCs to Coleman on behalf of Erath Iron. However, both Mrs. Boyd and Mr. Boyd played a role in completing the BBCs. Specifically, while Mrs. Boyd supplied all relevant receivables information, Mr. Boyd was responsible for supplying all relevant inventory information.

In the latter case, as indicated above, the BBCs required disclosure of both the estimated fair market value of all inventory and the value of such inventory at cost. For purposes of providing

---

[15] _See, e.g._, Jt. Tr. Exh. 69 (8/2011 BBC).

[16] _See id._, at p.2.

[17] _See, e.g._, Jt. Tr. Exh. 70, at pp.3-4.

the fair market valuations, Mr. Boyd would first come up with an estimate of the total tonnage of all scrap metal located at the yards by visually inspecting the yards, basing the estimate on his prior experience in overseeing inventory purchases – a methodology learned from Mr. Smith when Mr. Boyd worked with him.[18]  Next, relying upon both publicly-available metals pricing information and his understanding of what other scrap yards were paying for particular categories of metal scrap, Mr. Boyd would establish a fixed price for each category of metal.  Then, utilizing the tonnage and pricing estimates, the fair market value would be calculated for inclusion on the BBCs.[19]

In reporting inventory cost figures, on the other hand, while Erath Iron maintained a ScrapTrax software system that was used to calculate and record individual scrap purchase transactions, instead of using the actual cost figures recorded in the ScrapTrax system, Mr. Boyd directed Mrs. Boyd to simply discount the fair market values supplied by a fixed percentage(s) (generally in the range of 75% to 90%) to arrive at an aggregate cost estimate.  The Boyds never disclosed to Coleman that instead of providing actual cost figures in the BBCs, they were utilizing this truncated, less precise methodology.

Turning to other record-keeping practices, because the scrap metal business is highly cash driven (or at least it was for Erath Iron at all relevant times), it was necessary for Erath Iron to have a system in place to keep track of all cash transactions and thereby enable the cash drawer at each yard to be reconciled at the end of each day.  This was necessary to both ensure that all cash was accounted for and ensure that the yard had enough cash on hand for the next day's business.  Because the ScrapTrax software system was used to weigh in loads of scrap, calculate the amounts

---

[18] Occasionally, for one or more of the smaller satellite yards, Mr. Boyd would rely upon a tonnage estimate provided by Tanner Ballew, an Erath Iron employee who worked closely with Mr. Boyd in managing the scrap yard operations.

[19] *See, e.g.*, Jt. Tr. Exh. 70, at p.2.

due on purchases, and record all scrap purchase transactions, the Boyds used the ScrapTrax system to also reconcile their cash drawers on a daily basis.

While this methodology worked seamlessly in accounting for scrap purchases, it did not work well in the case of withdrawals from the cash drawers for things other than scrap purchases. As for the non-scrap-purchase withdrawals, instead of developing a system to accurately account for them, Mr. Boyd directed the ScrapTrax operator to simply record dummy scrap purchase transactions using a made-up purchaser (typically, RJ Machine)[20] or a made up purchaser license plate entry. When Mr. Boyd determined to pay a "tire bonus" to a driver who managed to deliver scrap from a satellite yard to the main Stephenville yard without puncturing a company truck tire, for example, he would pull money from the cash drawer and direct the ScrapTrax operator to enter a scrap purchase transaction under the license plate entry "BLUE DOD 3500" or "RED DOD 3500" ("DOD" being short for Dodge).[21] While this methodology facilitated a reconciliation of the cash drawers, it led to misleading expense reporting within the company's accounting system and on financial statements.

Finally, with respect to the preparation of periodic financial statements of Erath Iron and the Boyds required by Coleman,[22] the Boyds obtained accounting assistance from the firm Sproles Woodard LLP ("**Sproles**"). Sproles would compile the financial statements using financial information supplied by the Boyds. For Erath Iron balance sheet purposes, the inventory figures supplied to Sproles were pulled from BBCs corresponding to the applicable dates at issue (which, in turn, incorporated information that had previously been supplied by Mr. Boyd). For Erath Iron

---

[20] Mr. Boyd used RJ Machine because Erath Iron never conducted business with RJ Machine on a cash basis. *See* Jt. Tr. Exh. 59 (Martin deposition, at 40:10-12 and 41:1-6); *see also* Jt. Tr. Exh. 58 (Costin deposition, at 38:24-41:20 and 43:5-45:22).

[21] *See, e.g.*, Jt. Tr. Exh. 113, at pp.3 and 12.

[22] *See, e.g.*, Jt. Tr. Exhs. 95, 97-99, and 101-102 (Erath Iron financial statements), 100, 103, and 124-126 (Boyd financial statements).

income statement purposes, the expense figures supplied to Sproles included recorded ScrapTrax transaction data. Importantly, Sproles' engagement did not provide for any auditing services and Sproles did not perform any procedures to verify the accuracy or completeness of the information supplied to it, nor did Sproles express any opinion, conclusion, or form of assurance with respect to the information reported within the financial statements.[23] Sproles simply compiled Erath Iron's and the Boyds' financial statements using the financial information supplied to it by the Boyds.

**F.     *The Early Days of the Coleman Lending Relationship***

For several years, from 2011 to mid-2014, the lending relationship between Coleman and Erath Iron was very good. During this period, Erath Iron's business continued to expand. Indeed, by 2014, the business had close to $100 million in annual revenues. During this time frame the Boyds also continued to expand their business enterprise. By the end of 2014, the Boyds had added, among other entities, 5 Star Recycling, LLC, EIM Express, LLC, Erath Aviation, LLC (which acquired a jet and a helicopter), and La Tierra de Los Vaqueros, LLC (which acquired a large rodeo colosseum).[24]

As previously indicated, on an annual basis the Line of Credit was subject to renewal. As part of the annual underwriting process, Coleman would review and consider, among other things, current financial statements of Erath Iron and the Boyds, BBCs that had been submitted during the reporting period, reported inventory and accounts receivable levels and valuations, and trending in relation to inventory and accounts receivable levels and valuations. Additionally, Coleman would conduct site visits of both the primary Stephenville scrapyard and some or all of the satellite scrapyards, and Mr. Scott would confer with management of Erath Iron on the financial

---

[23] *See, e.g.*, Jt. Tr. Exh. 97, at p.3 (statement of scope and limitations of Sproles engagement).

[24] *See* Jt. Tr. Exh. 100 (12/31/2014 balance sheet of the Boyds); *see also* Jt. Tr. Exh. 15 (organizational documents of the entities).

information supplied, including, in particular, Mr. Boyd with respect to inventory levels reported and the results of the site visits.

Taking these factors into consideration, when the Line of Credit was renewed in 2012, the maximum availability under the line was increased to $7 million and the Inventory Cap was increased to $4.2 million.[25]  By the time of the renewal of the Line of Credit in 2014, the maximum availability under the line was up to $7.5 million, the Applicable A/R Percentage was up to 80%, and the Inventory Cap was up to $5 million.[26]  With each new renewal, new guarantees were also executed.[27]

### G.    The Boyds' Relationship Splinters

While things were good at Erath Iron between 2011 and mid-2014, the same cannot be said of the Boyds' relationship.  To the contrary, the Boyds' relationship began to rapidly deteriorate after Mr. Boyd commenced a long-term affair with Kathleen Murphy, beginning in 2012.

In this regard, by 2011 Erath Iron had begun to conduct business with Murphy Scott Resources, L.P. ("**MSR**"), a fuel and lubricant distributor with a base of operations located adjacent to Erath Iron's Alvarado yard.  At all relevant times, Ms. Murphy served as the President of MSR.  Mr. Boyd and Ms. Murphy met as a result of being business neighbors, and by early 2012 they had become more than just friends.  By March 2012, Mr. Boyd had begun to spend extended periods of time with Ms. Murphy at a property in Alvarado owned directly or indirectly by Ms. Murphy.

Toward the end of 2013, Mrs. Boyd learned of the Murphy affair, including the fact that Mr. Boyd had fathered a child with Ms. Muphy.  Unsurprisingly, this led to a breakdown in

---

[25] *See, e.g.*, Jt. Tr. Exh. 79 (6/2012 BBC).

[26] *See, e.g.*, Jt. Tr. Exh. 111 (5/2015 BBC).

[27] *See, e.g.,* Jt. Tr. Exh. 10, at pp.5-10 (guaranty agreements executed in connection with 2012 and 2014 renewals).

communication between the Boyds, and their relational tension correspondingly created operational tension at Erath Iron and the Boyds' other businesses. By the end of 2014, Mr. Boyd was living continuously with Ms. Murphy. Coleman was unaware of these developments.

### H. *The Commodity Market Falters, Erath Iron Struggles, and Coleman Steps Up Its Line Renewal Diligence*

Also in 2014, the metal commodities market began to suffer a significant downturn. This negatively impacted the fair market value of Erath Iron's inventory. Because of the methodology used by Mr. Boyd to calculate the cost value of inventory for BBC purposes, the downturn also negatively impacted availability under the Line of Credit.

Needless to say, the loss in inventory value and industry unsteadiness caused Coleman to heighten its diligence in connection with a renewal of the Line of Credit in 2014. Among other things, Mr. Scott communicated to Mr. Boyd that Coleman was looking at the possibility of a 90-day renewal instead of a normal full year renewal.[28] Additionally, Mr. Scott encouraged the Boyds to consider paying off the shredder loan so that the shredder could be offered up as additional collateral to support the line.[29] That said, ultimately Coleman agreed to renew on standard terms. However, Coleman and the bank group remained concerned.

Thereafter, matters did not improve. As availability under the Line of Credit continued to be negatively impacted, Erath Iron's ability to purchase new scrap metal inventory was also negatively impacted.[30] Thus, Erath Iron began to experience a steady decrease in the volume of

---

[28] *See, e.g.*, Jt. Tr. Exh. 109, at pp.7-9 (text messages between Mr. Scott and Mr. Boyd).

[29] *See id.*, at pp.9-11 (text messages between Mr. Scott and Mr. Boyd regarding leveraging the equipment, referring to the shredder).

[30] *Compare, e.g.*, Jt. Tr. Exh. 111 (5/2015 BBC reporting fair market value of inventory at $12,186,137 and at cost value of such inventory at $10,114,493.71) *to* Jt. Tr. Exh. 112 (8/2015 BBC reporting fair market value of inventory at $8,164,024 and at cost value of such inventory at $7,3476,621.60).

its inventory.[31]   As these challenges continued into the Spring of 2015, Erath Iron also became

tardy in delivering monthly BBCs and in making regular loan payments.  Coupled with its concern

about the level of funds that the Boyds had been taking out of Erath Iron to make large expenditures

for other entities (*e.g.*, the helicopter and colosseum), Coleman noticeably stepped up its due

diligence in evaluating a further Line of Credit renewal in 2015.

Among other things, to test the accuracy of inventory information reported to Coleman,

Coleman hired Rosen Systems, Inc., an appraisal firm, to conduct an appraisal of the inventory on

site at Erath Iron's two largest yards – the Stephenville yard and the Big Spring yard.  Rosen

completed the work and came back with a fair market appraisal of $2,081.955 as of October 12,

2015, a figure substantially lower than the fair market value of $8,164,024 that Erath Iron had

reported for all of the yards in August 2015 and the fair market value of $6,489,135 that Erath Iron

had reported for all of the yards in October 2015.[32]

When confronted with the difference by Mr. Scott, Mr. Boyd convinced Mr. Scott that the

Rosen valuation was not indicative of the true value of Erath Iron's inventory because the valuation

did not include inventory at *all* of the Erath Iron scrapyards and because Rosen, according to Mr.

Boyd, lacked sufficient experience in the scrap metal industry to properly value the inventory.  Mr.

Boyd sought to bolster his position by coordinating on-site visits to the yards that were not covered

by the Rosen report with Mr. Scott so that Mr. Scott could see, for himself, the amount of inventory

at those yards.  Additionally and significantly, Mr. Boyd represented to Mr. Scott that he was

working on a large demolition job in south Texas that would result in Erath Iron acquiring a

substantial amount of additional scrap metal that had not yet been reported in any of the BBCs or

---

[31] *Compare, e.g.*, Jt. Tr. Exh. 111 (5/2015 BBC reporting 29,860 tons of steel) *to* Jt. Tr. Exh. 112 (8/2015 BBC reporting 20,420 tons of steel).

[32] *See* Jt. Tr. Exh. 130 (Rosen Systems appraisal); Jt. Tr. Exh. 112 (8/2015 BBC); Jt. Tr. Exh. 94 (summary of reported information in BBCs in 2015).

financial statements.  As further explained below, however, it would later be discovered that there was no such south Texas demolition job.

While Mr. Scott relied upon Mr. Boyd's representations in ultimately causing Coleman to provide a renewal, Coleman also pushed for additional collateral to immediately shore up its level of security for the credit.[33]  To satisfy that demand, the Boyds agreed to put up all of the rolling stock owned or used by Erath Iron as additional collateral, thereby enabling Erath Iron to take out a new loan secured by the equipment for use in paying down a portion of the Line of Credit.  The Boyds also agreed to provide for a junior lien on the colosseum owned by La Tierra de Los Vaqueros, LLC.

Thus, based upon the verbal assurances of Mr. Boyd and the securing of additional collateral, on or about November 4, 2015, Erath Iron obtained a 6-month renewal of the Line of Credit, resulting in a new maturity of May 4, 2016.[34]  Under the renewed line, the maximum amount of availability was reduced to $6.0 million and the Inventory Cap was reduced to $4 million.[35]  On or about the same date, Erath Iron obtained a new equipment loan in the amount of $1.75 million, which Erath Iron used to partially pay down amounts then-owed under the Line of Credit (the "**Equipment Loan**").[36]  The Equipment Loan had a maturity of May 4, 2020, and was secured by the rolling stock equipment.  In connection with the renewal and new loan, Mr. Boyd again executed guarantees.[37]

---

[33] *See, e.g.*, Jt. Tr. Exh. 109, at pp.16-17 (text messages between Mr. Scott and Mr. Boyd).

[34] *See* Jt. Tr. Exhs. 9 and 149 (11/2015 Line of Credit renewal documentation).

[35] *See* Jt. Tr. Exh. 87 (1/2016 BBC).

[36] *See* Jt. Tr. Exh. 8 (Equipment Loan documentation).

[37] *See* Jt. Tr. Exh. 10, at pp.11-14 and 19-22 (executed guaranty agreements).

**I.**    ***Erath Iron Reports Increased Inventory Levels and Coleman Agrees to an Additional Renewal of the Line of Credit Along with a Refinance of the Real Estate Loan***

Following renewal of the Line of Credit in November 2015, Erath Iron began to report monthly increases in both the volume and value of its inventory.  In January 2016, for example, Erath Iron reported 25,870 tons of steel as compared to 20,420 tons of steel in August 2015, and reported a fair market value for all of its inventory of $8,970,196 as compared to $6,489,135 in October 2015.[38]  In February 2016, Erath Iron reported 26,500 tons of steel and reported a fair market value for all of its inventory of $9,169,531.[39]  Finally, in April 2016, in advance of the May 2016 renewal, Erath Iron reported 28,740 tons of steel and reported a fair market value for all of its inventory of $11,710,971.[40]

Given the improved reporting and assurances provided to Mr. Scott by Mr. Boyd, Coleman agreed to an additional 6-month renewal of the Line of Credit to November 4, 2016.[41] Additionally, in June 2016, Coleman agreed to refinance the Real Estate Loan, having an outstanding balance of $1,134,759.32, to a new maturity of February 15, 2022.[42]  Mr. Boyd again executed guarantees of the loans.[43]

**J.**    ***The Boyds' Relationship Continues to Deteriorate;
Mr. Boyd Siphons Money Out of Erath Iron***

While matters purported to improve at Erath Iron after the November 2015 renewal, the same cannot be said for the Boyds' relationship.  Financially, the Boyds' separation from one

---

[38] *See* Jt. Tr. Exhs. 87 (1/2016 BBC), 94 (summary of 2015 BBC reported figures), and 112 (8/2015 BBC).

[39] *See* Jt. Tr. Exh. 88 (2/2016 BBC).

[40] *See* Jt. Tr. Exh. 89 (4/2016 BBC).  Curiously, Erath Iron had no availability under the Line of Credit, raising questions with respect to the integrity of the inventory increases reported to Coleman.  Mr. Boyd remained in charge of determining inventory volumes, pricing, fair market values, and cost figures during this time frame.

[41] *See* Jt. Tr. Exh. 7 (Line of Credit documents)

[42] *See* Jt. Tr. Exh. 5 (Real Estate Loan documents).

[43] *See* Jt. Tr. Exh. 10, at pp.23-30 (executed guaranty agreements).

another created cash flow complications for Mr. Boyd. Because Mrs. Boyd had customarily handled the Boyds' finances, including the deposit of Mr. Boyd's paychecks into the Boyds' joint checking account, she had visibility into amounts spent by Mr. Boyd. Thus, ostensibly to conceal the nature and amount of his spending while living with Ms. Murphy, Mr. Boyd manufactured the false south Texas demolition job as a means to withdraw funds from the Erath Iron cash drawers, claiming that the funds were needed to cover contractor costs and other project expenses. He then used the withdrawn funds for the personal benefit of himself, Ms. Murphy, and their children while living with Ms. Murphy instead of for anything involving Erath Iron.

At trial, Mr. Boyd attempted to justify the withdrawals as nothing more than distributions to which he was purportedly entitled on account of his equity ownership in Erath Iron. However, in addition to arguably violating a distribution limitation set out in the loan agreements,[44] the withdrawals were never recorded as such within Erath Iron's records and financial statements.

In late February 2016, Mr. Boyd filed for divorce from Mrs. Boyd. When Mr. Scott learned of the filing, he expressed concern because of the integral role that both Mr. and Mrs. Boyd played in the operations of Erath Iron. Seeing Mr. Scott's reaction and appreciating the negative impact that it could have on the then-upcoming Line of Credit renewal, Mr. Boyd dismissed the case and reassured Mr. Scott that the Boyds had resolved their differences.[45] While the divorce action was, in fact, dismissed, in reality there had been no such reconciliation and Mr. Boyd continued to live apart from Mrs. Boyd.

---

[44] *See, e.g.*, Jt. Tr. Exh. 149, at p.3 (affirmative covenant in "Additional Requirements" section of agreement dictating that "Distributions are limited to no more than 50.00% of net income").

[45] *See, e.g.*, Jt. Tr. Exh. 109, at p.25 (text message from Mr. Boyd to Mr. Scott).

**K.**  **The House of Cards Comes Down and Mr. Boyd**
      **Continues to Distance Himself from Mrs. Boyd**

While Erath Iron reported improvements to Coleman in early 2016 per the submitted BBCs, by late Summer 2016 things were again getting worse and the company was having difficulty servicing its loans.  Thus, once again, Mr. Scott encouraged the Boyds to shore up the relationship with additional collateral or the infusion of additional capital into the company.  To provide time for the Boyds to pursue those options, Coleman agreed to restructure the Equipment Loan and Line of Credit to require the payment of interest only for six months.  Accordingly, in September 2016, Coleman and Erath Iron entered into a Change in Terms Agreement with respect to the Equipment Loan, and a Loan Modification & Extension Agreement with respect to the Line of Credit, in each case effective as of August 15, 2016.[46]  At the same time, Mr. Boyd executed a comprehensive Commercial Guaranty in relation to all of the outstanding loans, dated August 15, 2016 (the "**Guaranty Agreement**").[47]

At or about this same time, the Boyds approached Mr. Martin for help in saving Erath Iron.  Mrs. Boyd, in particular, took the lead in providing a variety of financial information to Mr. Martin in an effort to pique his interest in investing in the company.  Having knowledge of Mr. Boyd's extramarital activities and discerning a lack of financial controls at Erath Iron, however, Mr. Martin declined to engage.  The Boyds also offered to pledge their home as additional collateral to Coleman, but Coleman declined, believing it to not be legally feasible under applicable homestead exemption laws.

In or around this time frame, Mr. Boyd determined to reposition his primary workplace from the Stephenville yard to the Alvarado yard and Mr. Boyd, Ms. Murphy, and their children

---

[46] *See* Jt. Tr. Exh. 4 (Change in Terms Agreement); Jt. Tr. Exh. 7, at pp.4-9 (Loan Modification & Extension Agreement).

[47] *See* Jt. Tr. Exh. 10, at pp.31-34 (Guaranty Agreement).

moved into a new home in Rio Vista, Texas allegedly purchased by Ms. Murphy. Along with the shift in location came Mr. Boyd's effort to also fully separate his financial affairs from Mrs. Boyd. In this regard, Mr. Boyd opened an account in his own name at Pinnacle Bank and required all of his future paychecks to be delivered directly to him instead of having them deposited by Mrs. Boyd into their joint checking account. Mr. Boyd also obtained the use of a credit card supplied by Ms. Murphy, and to obtain immediate cash on his Erath Iron paychecks, as well as to facilitate the repayment of Ms. Murphy for amounts charged on the Murphy credit card, Mr. Boyd endorsed his paychecks over to MSR (or Knight Hawk Transport, a business line of MSR) in exchange for cash in the amount of the paychecks less the charges that he had made on the Murphy credit card.[48]

Ultimately, despite the restructuring opportunity accommodated by Coleman, Erath Iron failed to make interest payments in October 2016. At this point, Mr. Scott's communications to Mr. Boyd became more pointed and urgent.[49] Having no answers, Mr. Boyd simply continued to blame the market, assuring Mr. Scott that everything would be fine.[50] At the same time, however, Mr. Boyd stopped providing inventory information to Mrs. Boyd for inclusion in the BBCs and, correspondingly, Erath Iron became delinquent in submitting BBCs to Coleman. When pressed for the status of the delinquent BBCs in December 2016, Mr. Boyd assured Mr. Scott that they would be forthcoming.[51] However, that was false because he had no intention of providing any further inventory figures to Mrs. Boyd.

Lacking the BBCs, Mr. Scott scheduled visits to the Stephenville and Alvarado yards to visually inspect the inventory at those yards. In advance of the inspections, Mr. Boyd instructed

---

[48] *See, e.g.*, Jt. Tr. Exhs. 60-65 (sampling of paychecks endorsed over to MSR and Knight Hawk Transport).

[49] *See, e.g.*, Jr. Tr. Exh. 109, at p.38 (text messages from Mr. Scott to Mr. Boyd).

[50] *See id.*, at pp.38-39.

[51] *See id.*, at pp.40-41.

Mr. Ballew, an employee of Erath Iron, to stack piles of inventory on top of 40' sea containers to create the appearance of greater inventory volumes. Mr. Scott was unaware of the stacking. At trial, Mr. Boyd claimed that the stacking was legitimate because the sea containers also constituted metal inventory to be processed. However, the Court did not find this (or much else of Mr. Boyd's) testimony to be credible.

Ultimately, Coleman made formal demand on the loans in mid-December 2016 after Coleman was unable to verify that certain funds promised to be paid to Coleman were, in fact, available to be paid.[52] Coleman failed to cure the default. And while Mrs. Boyd had put an end to cash withdrawals from the scrapyard cash drawers, Mr. Boyd had already withdrawn hundreds of thousands of dollars from the cash drawers by this point (collectively, the "**Disguised Dividends**"), much of it under the guise of the fake south Texas demolition job.[53]

On January 9, 2017, Coleman provided notice of acceleration of each of the loans. On January 10, 2017, Mr. Scott met with the Boyds to discuss Coleman's expectations going forward. At that time, Mr. Scott emphasized to the Boyds that Coleman did not consent to any further sale, liquidation, disposition, or use of Coleman's collateral.[54] The following day, Coleman initiated litigation against Erath Iron in Texas state court, and on January 11, 2017, obtained a temporary restraining order (the "**Coleman TRO**") precluding Erath Iron and its officers and directors "from disposing of or in any way diminishing any collateral of any sort including all of Erath Iron & Metal, Inc.'s inventory, accounts or equipment, directly or indirectly."[55] The Coleman TRO was

---

[52] *See id.*, at pp.43-46.

[53] *See* Jt. Tr. Exh. 137 (ScrapTrax summary of dummy transactions since 1/2015 aggregating in excess of $997,000). While Mr. Boyd had an explanation for certain of the withdrawals – *e.g.*, the tire bonuses denoted with the Blue DOD, Red DOD terminology and certain withdrawals made whenever Mr. Boyd was allegedly out of town, *see* Jt. Tr. Exh. 150 – he had no explanation for the bulk of the entries.

[54] At or around this time, Mr. Boyd had orchestrated the sale of ten to fifteen roll off boxes constituting Coleman collateral. The sales proceeds were used for purposes *other* than paying down Coleman.

[55] *See* Jt. Tr. Exh. 20 (Coleman TRO).

served on Mr. Boyd on January 12, 2017.[56]  The Coleman TRO was also thereafter extended into February 2017.

Notwithstanding the Coleman TRO, the Boyds continued to operate Erath Iron and make payments from funds constituting Coleman collateral.  The payments included at least three different "dividend" checks to Mr. Boyd totaling in excess of $17,000, which Mr. Boyd cashed through MSR after being served with the Coleman TRO.[57]

**L.      *Mr. Boyd Files for Bankruptcy Protection and Takes Steps to Further Distance Himself from Erath Iron and Mrs. Boyd***

Following the January 10th meeting with Mr. Scott, seeing the writing on the wall with respect to the future of Erath Iron and being unable to pay off the loans as required by the Guaranty Agreement, Mr. Boyd decided to consult with bankruptcy counsel.  With the assistance of Ms. Murphy, a meeting was set up with Alice Bower, a local bankruptcy attorney, and after the meeting Mr. Boyd agreed to hire Mrs. Bower.  Ms. Murphy purportedly funded the $12,000 retainer required by Mrs. Bower.  A few weeks later, on February 3, 2017 (the "**Petition Date**"), Mr. Boyd filed his original petition for relief under chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case.  Marilyn Garner (the "**Trustee**") was appointed to serve as the trustee of Mr. Boyd's bankruptcy estate.

On the eve of the bankruptcy filing, Mr. Boyd terminated his day-to-day involvement with Erath Iron.  Supposedly immediately after the filing, Mr. Boyd and Ms. Murphy began their own scrapyard business under the name Spitfire Metal.  Because Ms. Murphy had no prior experience in the scrap metal business, Mr. Boyd's involvement in Spitfire Metal was critical to its viability.  Conveniently, the scrapyard was located adjacent to the Erath Iron Alvarado yard, giving Mr. Boyd

---

[56] *See id.*, at p.2 (executed proof of service).

[57] *See* Jt. Tr. Exh. 105, at pp.12-13.

easy access to scrap located at the Alvarado yard. While Mr. Boyd and Ms. Murphy testified that the business was solely owned by MSR, Mr. Boyd acknowledged that he started the business for the long-term benefit of his and Ms. Murphy's kids.

Separately, shortly after the Petition Date, Mr. Boyd again filed suit against Mrs. Boyd to obtain a divorce. Unsurprisingly, when combined with the cash flow problems at Erath Iron, the Coleman litigation, and Mr. Boyd's abdication of all responsibility to Erath Iron, Mrs. Boyd concluded that Erath Iron also needed bankruptcy protection. Thus, on February 22, 2017, Mrs. Boyd caused Erath Iron to file its own petition for bankruptcy relief, thereby initiating Case No. 17-40693 with the Court (the "**Erath Bankruptcy Case**").

## M.    *Mr. Boyd's Financial Disclosures*

Prior to the filing of Mr. Boyd's bankruptcy case, Mrs. Bower provided a comprehensive bankruptcy informational and planning workbook to Mr. Boyd for use in, among other things, compiling information on his assets, liabilities, and prepetition income, transfers, and business affairs. Mr. Boyd also completed a credit counseling course prior to the filing.[58] With the benefit of the pre-filing resources, education, consultation, and planning, Mr. Boyd provided a variety of sworn financial disclosures in the Bankruptcy Case, some of which are detailed below.[59]

### 1.    *The Petition Disclosures*

In signing his bankruptcy petition (the "**Original Petition**"), Mr. Boyd verified under penalty of perjury that the information provided therein was true and correct.[60] Within the Original

---

[58] *See* Bankruptcy Case Docket No. 2 (Certificate of Counseling).

[59] The Court notes that there are a whole host of internally inconsistent and questionable financial disclosures made by Mr. Boyd within his Filed Original Schedules, Filed Amended Schedules, and Filed SOFA. While numerous of these discrepancies and questionable disclosures were brought to light by Coleman during the trial, ceratin of them are not discussed further herein because they were neither raised within the Complaint nor identified within the parties' joint Pretrial Order.

[60] *See* Jt. Tr. Exh. 31 (Original Petition), at p.7.

Petition, Mr. Boyd estimated the worth of his assets as between $0-$50,000 and the amount of his liabilities as between $500,001-$1 million.[61]  These disclosures were knowingly false.

Not until more than four months later, on June 7, 2017, after the accuracy of such disclosures were called into question, did Mr. Boyd file an amended petition (the "**Amended Petition**").[62]  In signing the Amended Petition, Mr. Boyd again certified under penalty of perjury that the information provided therein was true and correct.[63]  In the Amended Petition, Mr. Boyd substantially increased the estimated worth of his assets to between $10,000,001-$50 million and substantially increased the estimated amount of his liabilities to between $10,000,001-$50 million.[64]  However, he contemporaneously brough confusion to those changes in adding that he was also the purported sole proprietor of Erath Iron, thereby ostensibly causing the asset and liability figures reported to include the assets and liabilities of Erath Iron.[65]  Mr. Boyd's disclosed ownership of Erath Iron as a sole proprietorship was knowingly false.  As explained in the petition form, "[a] sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC."[66]  The Boyds always maintained Erath Iron as a separate legal entity.  Thus, Mr. Boyd knowingly made this false statement with the intent to obfuscate the true extent of his individual financial situation.

### 2.    *The Schedules and Statement of Financial Affairs*

Among the filings required by a debtor within fourteen days of the bankruptcy filing are a series of schedules that detail, among other things, the debtor's assets, liabilities, and income (the

---

[61] *See id.*, at p.6 (responses to Questions 19 and 20).

[62] *See* Jt. Tr. Exh. 46 (Amended Petition).

[63] *See id.*, at p.8.

[64] *See id.*, at p.7 (responses to Questions 19 and 20).

[65] *See id.*, at p.5 (response to Question 12).

[66] *See id.*

"**Schedules**"), and a statement of financial affairs that details, among other things, prepetition income, transfers, and other business affairs (the "**SOFA**").[67]  The Schedules and SOFA are documents that a debtor is required to verify as complete and accurate under penalty of perjury. Mr. Boyd had the benefit of the comprehensive workbook supplied by Mrs. Bower in compiling the information needed for the Schedules and SOFA.  To complete the workbook, Mr. Boyd would need to review a variety of personal and business financial records that were stored at Erath Iron's Stephenville business office.

As part owner of the Boyds' personal records, Mr. Boyd had the legal right to access such personal records.  As part owner of Erath Iron and all of the other entities jointly owned by the Boyds (in addition to being an officer, director, and/or manager of such entities), Mr. Boyd also had the legal right to access the business records of each of those entities.  Notwithstanding those rights, Mr. Boyd never attempted to visit the Stephenville business office to review the personal and business records needed to complete his Schedules and SOFA.  When pressed for an explanation, Mr. Boyd flimsily testified that he felt "unwelcome" at the Stephenville scrapyard. So, instead, he turned to Mrs. Bower to deal with it, exaggeratedly claiming that Mrs. Boyd controlled all of the records and would be uncooperative.  This resulted in unnecessary controversy and delay.

In particular, on the day of the bankruptcy filing, Mrs. Bower served a subpoena on Mrs. Boyd to compel *her* to produce 27 different categories of records.[68]  Unsurprisingly, the subpoena was met with resistance and annoyance from Mrs. Boyd given its adversarial nature and attempt to effectively compel Mrs. Boyd to do *Mr. Boyd's job* of compiling necessary financial information

---

[67] *See* Fed. R. Bankr. P. 1007(b)-(c).

[68] *See* Jt. Tr. Exh. 35-1 (copy of subpoena).

for *his* bankruptcy case. Ultimately, the subpoena issues were resolved,[69] but Mr. Boyd conveniently used the subpoena as an excuse to obtain multiple extensions of time for the filing of his Schedules and SOFA (through June 5, 2017, four months after the Petition Date).[70]

In the end, Mr. Boyd spent roughly 30 to 40 hours (with the assistance of Ms. Murphy) completing the informational workbook for the Schedules and SOFA. Whenever Mr. Boyd had a question, he obtained the assistance of Mrs. Bower and/or Brandon Warren, another attorney in Mrs. Bower's office. Once the workbook was complete, Mrs. Bower met with Mr. Boyd, in person, to go over the worksheets. Then, once the Schedules and SOFA were compiled based upon the information supplied by Mr. Boyd, Mrs. Bower again advised Mr. Boyd that he would be signing the Schedules and SOFA under penalty of perjury and instructed Mr. Boyd to carefully review each of the documents before signing them. Mr. Boyd did so, signing his Schedules (the "**Filed Original Schedules**") and SOFA (the "**Filed SOFA**") on June 6, 2017, and they were filed with the Court.[71]

### a. Prepetition Income Disclosures

Question 4 of the SOFA requires a debtor's disclosure of prepetition income from employment and from operating a business during the year of the bankruptcy filing and during the two previous calendar years. It instructs a debtor to fill in the total amount of income received from all jobs and all businesses, including part-time activities. In the Filed SOFA, Mr. Boyd disclosed in response to Question 4 that he received "wages, commissions, bonusses, tips" in the following amounts: 2015 – "unknown"; 2016 – $298,269.05; and 2017 (between January 1 and

---

[69] By order of the Court, Mr. Boyd was granted access to certain records and Mrs. Boyd was required to produce certain categories of records by April 25, 2017. *See* Jt. Tr. Exh. 40.

[70] *See* Bankruptcy Case Docket Nos. 16, 21, 29 and 39 (extension orders).

[71] *See* Jt. Tr. Exh. 42 (Filed Original Schedules); Jt. Tr. Exh. 43 (Filed SOFA).

the Petition Date) – $21,373.67.  In none of the years did he report that he had received any income from "operating a business."[72]

Question 5 of the SOFA requires a debtor's disclosure of any other income during the same time frame.  It instructs a debtor to include income regardless of whether the income is taxable.  In the Filed SOFA, Mr. Boyd disclosed the following amounts: 2015 – "unknown"; 2016 – $315,990; and 2017 – "unknown".[73]

In neither of the responses to Questions 4 and 5 did Mr. Boyd disclose the amount of the Disguised Dividends, including the south Texas demolition job cash withdrawals.  Mr. Boyd never amended the Filed SOFA to refine or supplement the disclosures.

### b. Prepetition Transfer Disclosures

Question 7 of the SOFA requires a debtor's disclosure of all payments made within one year of the bankruptcy filing on a debt owed to an insider, and Question 8 of the SOFA requires a debtor's disclosure of all payments and transfers made within one year of the bankruptcy filing on account of a debt that benefited an insider.  In the Filed SOFA, Mr. Boyd disclosed that there were no such payments or transfers.[74]

Question 13 of the SOFA requires a debtor's disclosure of gifts given to any one person within two years of the bankruptcy filing having a total value of more than $600, and Question 14 of the SOFA requires a debtor's disclosure of gifts given to any one charity within two years of the bankruptcy filing having a total value of more than $600.  In the Filed SOFA, Mr. Boyd disclosed that were no such gifts.[75]

---

[72] See Filed SOFA, at p.2 (response to Question 4).

[73] See id. (response to Question 5).

[74] See id., at p.3 (responses to Questions 7 and 8).

[75] See id., at p.5 (responses to Questions 13 and 14).

Question 18 of the SOFA requires a debtor's disclosure of all transfers of property within two years of the bankruptcy filing to anyone outside of the ordinary course of the debtor's business or financial affairs.  In the Filed SOFA, Mr. Boyd disclosed that there were no such transfers.[76]

### c. Postpetition Expense Disclosures

Pursuant to Schedule J of the Schedules, a debtor is required to disclose the number and relationship of the debtor's dependents and an estimate of the debtor's ongoing monthly expenses. To facilitate the disclosure of expenses, Schedule J provides separate line items for the disclosure of specific categories of expenses, such as rental or home ownership expenses, mortgage costs, homeowner's association dues, utilities, food and housekeeping supplies, childcare and children's education costs, clothing, laundry and dry cleaning, medical and dental expenses, transportation, entertainment, clubs and recreation, insurance, taxes, and lease obligations.

In Schedule J of the Filed Original Schedules, while Mr. Boyd disclosed that he had four dependent children, he claimed to have no ongoing monthly expenses.[77]  In other words, while prior to the Petition Date Mr. Boyd regularly used the Murphy credit card to cover personal expenses and had a system in place to provide for the reimbursement of such credit card charges,[78] suddenly as of the Petition Date, he no longer had *any* ongoing monthly expenses whatsoever. Correspondingly, while Mr. Boyd separately identified Spitfire Metal as his employer as of the Petition Date in Schedule I, he conflictingly also claimed to be unemployed and claimed to have no regular income from Spitfire Metal.[79]  Mr. Boyd never amended Schedule I or Schedule J of the Filed Original Schedules.

---

[76] *See id.*, at p.6 (response to Question 18).

[77] *See* Filed Original Schedules, Schedule J.

[78] *See, e.g.*, Jt. Tr. Exh. 104 (copy of credit card billings).

[79] *See* Filed Original Schedules, Schedule I.

### d. Disclosed Value of Interests in Boyd Businesses

Question 19 of Schedule A/B of the Schedules requires a debtor's disclosure of non-publicly traded stock and interests in incorporated and unincorporated businesses, including the name of each entity, the debtor's percentage ownership in the entity, and the current value (as of the time of the bankruptcy filing) of the debtor's percentage ownership in the entity.[80]  In the Filed Original Schedules, Mr. Boyd provided knowingly misleading sworn disclosures in response to Question 19.

Starting with Erath Iron, Mr. Boyd disclosed in Schedule A/B that he owned a 50% interest in the entity.[81]  In his Amended Petition, however, Mr. Boyd claimed that Erath Iron was a sole proprietorship.[82]  And at trial, Mr. Boyd claimed to own a 49% ownership interest in Erath Iron (instead of 50% interest).  At a minimum, two out of the three of these sworn statements were false and Mr. Boyd never took steps to correct any of the false statements.

As for other Boyd entities listed in Schedule A/B, while Mr. Boyd disclosed an ownership interest of 50% in each such entity, in many cases he then identified the value of his 50% interest as having the exact same value as the total disclosed value of the assets of the entity.[83]  For example, in the case of Jefe Land, a real estate holding company, while Mr. Boyd disclosed the total value of the real estate owned by the entity as $3.5 million, he then disclosed the value of his 50% interest in the entity as also $3.5 million.  Similarly, in the case of Erath Iron & Metal RE LLC, another real estate holding company, while Mr. Boyd disclosed the total value of the real estate owned by the entity as $2.75 million, he then disclosed the value of his 50% interest in the

---

[80] See Filed Original Schedules, at p.5 (introduction to Part 4 of Schedule A/B and Question 19 of Schedule A/B).

[81] See id. (response to Question 19 of Schedule A/B).

[82] See Amended Petition (response to Question 12).

[83] See Filed Original Schedules (responses to Question 19 of Schedule A/B).

entity as also $2.75 million.  While at first blush it might appear as though Mr. Boyd simply misunderstood what value was to be reported with respect to his 50% interest, it is significant to note that in the case of Erath Iron, he disclosed the business' total value as $10,375,324.71 but then listed $5,187,662.36 as the value of his 50% interest, thereby evidencing an understanding of how to calculate the value of his less than 100% interest in the entity.[84]

On October 26, 2017, and then again on April 9, 2018, Mr. Boyd filed an amended Schedule A/B (together, the "**Filed Amended Schedules**").[85]  Neither of the Filed Amended Schedules amended any of the ownership valuation assertions within the Filed Original Schedules.

### e. Disclosures in Relation to Brad Boyd Dynasty Trust

Question 25 of Schedule A/B of the Schedules requires a debtor to disclose if he owns or has any legal or equitable interest in any trusts and, if so, the value of such interest.  In the Filed Original Schedules, Mr. Boyd disclosed having an interest in the Brad Boyd Dynasty Trust with an unknown value.  Curiously, Mr. Boyd further disclosed that "[t]his trust was set up without Debtor's knowledge.  Debtor has no insight on the value of this asset."[86]  Separately, Question 31 of Schedule A/B of the Schedules requires a debtor to disclose if he owns or has any legal or equitable interest in any insurance policies.  In response to Question 31, and despite claiming to have no knowledge about the Brad Boyd Dynasty Trust and its value, Mr. Boyd disclosed the existence of a Farm Bureau Life Insurance Policy as to which he "believe[d] … the beneficiary [to be] the Brad Boyd Dynasty Trust."[87]

---

[84] *See id.*

[85] *See* Jt. Tr. Exhs. 50 and 51.

[86] *See* Filed Original Schedules (response to Question 25 of Schedule A/B).

[87] *See* Filed Original Schedules (response to Question 31).

In both of the Filed Amended Schedules, Mr. Boyd included amended responses to Questions 25 and 31. No longer claiming to lack any knowledge about the Brad Boyd Dynasty Trust, in the Filed Amended Schedules Mr. Boyd disclosed that "[t]his trust was set up to hold a life insurance policy" and that "[t]he status of the life insurance policy is being verified with Farm Bureau. Upon response from Farm Bureau, this response will be supplemented."[88] Neither his response to Question 25 nor his response to Question 31 of Schedule A/B was ever further amended or otherwise "supplemented."

### f. Lack of Disclosure of Connection to Spitfire United

Question 27 of the SOFA requires a debtor to disclose, among other things, all entities in which the debtor served as a director within four years of the bankruptcy filing. The disclosure of this information is important to a trustee's/creditor's ability to further investigate the debtor's financial dealings with such entities and any of their known affiliates.

On March 2, 2016, within less than a year of the Petition Date, Spitfire United, Inc. was organized as a Texas corporation.[89] Pursuant to the Certificate of Formation, the initial directors of Spitfire United included both Mr. Boyd and Ms. Murphy.[90] In the Filed SOFA, despite serving as a director of Spitfire United and having a hand in the creation of the Spitfire Metal business line of MSR, Mr. Boyd failed to disclose that he was a director of Spitfire United.[91] Mr. Boyd never amended the Filed SOFA to disclose this connection.

---

[88] *See* Filed Amended Schedules (amended responses to Questions 25 and 31).

[89] *See* Jt. Tr. Exh. 15, at pp.43-49 (filed Certificate of Formation of Spitfire United, Inc.).

[90] *See id.*, at p.48 (¶ 12).

[91] *See* Filed SOFA (response to Question 27).

### g. Lack of Disclosure of Provision of Financial Statements

Question 28 of the SOFA requires a debtor to disclose the identify of every financial institution, creditor, or other party to whom the debtor gave a financial statement about the debtor's business within two years of the bankruptcy filing. The disclosure of this information is important to a trustee's/creditor's ability to evaluate the completeness and truthfulness of the debtor's disclosures of assets and liabilities in the Schedules.

In the Filed SOFA, Mr. Boyd disclosed that no one had been provided a financial statement during within the prepetition two-year time frame.[92] This response was knowingly false inasmuch as personal financial statements had been provided to Coleman. While it is almost certain that financial statements were also provided to others, Mr. Boyd never amended the Filed SOFA to correct his response to Question 28.

### N.    The Guaranty Claims

As of January 9, 2017, the date on which Coleman accelerated each of the outstanding loans, the following amounts were owed on the loans by Erath Iron: $1,139,289.35 in principal and accrued interest on the Real Estate Loan; $5,948,726.72 in principal and accrued interest on the Line of Credit; and $1,701,639.36 in principal and accrued interest on the Equipment Loan. Using those figures, Coleman asserted the following claims in the Erath Bankruptcy Case (collectively, the "**Erath Iron Claims**"): Claim No. 51 (on account of the Real Estate Loan) in the amount of $1,139,289.35 in principal and accrued interest as of January 9, 2017, plus additional prepetition accrued interest and expenses; Claim No. 50 (on account of the Line of Credit) in the amount of $5,948,726.72 in principal and accrued interest as of January 9, 2017, plus additional prepetition accrued interest and expenses; and Claim No. 49 (on account of the Equipment Loan)

---

[92] *See* Filed SOFA (response to Question 28).

in the amount of $1,701,639.36 in principal and accrued interest as of January 9, 2017, plus additional prepetition accrued interest and expenses.[93]   No objections were ever lodged to the allowance of any of the Erath Iron Claims in the Erath Bankruptcy Case and, as such, they were deemed allowed as filed.

Based upon the Guaranty Agreement executed by Boyd,[94] Coleman filed corresponding claims in the Boyd Bankruptcy Case (collectively, the "**Guaranty Claims**"): Claim No. 17-1 (on account of the Real Estate Loan and Guaranty Agreement) in the amount of $1,139,289.35 in principal and accrued interest as of January 9, 2017, plus additional prepetition accrued interest and expenses (the "**Real Estate Loan Claim**"); Claim No. 18-1 (on account of the Line of Credit and Guaranty Agreement) in the amount of $5,948,726.72 in principal and accrued interest as of January 9, 2017, plus additional prepetition accrued interest and expenses (the "**Line of Credit Claim**"); and Claim No. 16-1 (on account of the Equipment Loan and Guaranty Agreement) in the amount of $1,701,639.36 in principal and accrued interest as of January 9, 2017, plus additional prepetition accrued interest and expenses (the "**Equipment Loan Claim**").[95]

In May 2017, Coleman obtained relief from the automatic stay in the Erath Bankruptcy Case to enable it to pursue collection against collateral securing the loans.[96]   Thereafter, on October 17, 2017, the Erath Bankruptcy Case converted from a proceeding under chapter 11 of the Bankruptcy Code to a proceeding under chapter 7 of the Bankruptcy Code.[97]   While no post-conversion payments were made on the Erath Iron Claims by the Erath Iron trustee,[98] through the

---

[93] *See* Erath Bankruptcy Case Claim Nos. 49-51; *see also* Jt. Tr. Exhs. 27-29 (copies of Coleman proofs of claim).

[94] *See* Jt. Tr. Exh. 10 (copies of guaranty agreements).

[95] *See* Bankruptcy Case Claim Nos. 16-1, 17-1, and 18-1.

[96] *See* Erath Bankruptcy Case Docket Nos. 107 and 208.

[97] *See* Erath Bankruptcy Case Docket No. 308 (conversion order).

[98] *See* Erath Bankruptcy Case Docket No. 553 (Erath Iron trustee's final report and accounting in Erath Bankruptcy Case); *see also* Erath Bankruptcy Case 1/13/2022 Docket Entry (reflecting closing of case).

exercise of collection rights against the collateral, Coleman was able to fully satisfy all amounts owed to it on the Real Estate Loan and to partially satisfy amounts owed to it on the Equipment Loan. Consequently, in the Boyd Bankruptcy Case, Coleman amended the Guaranty Claims as follows: first, Coleman filed Claim No. 17-2 to reduce the Real Estate Loan Claim to $0;[99] second, Coleman filed Claim No. 16-2 to reduce the Equipment Loan Claim to $1,119,402.17 in principal, plus $303,357.99 in accrued interest, as of February 1, 2019;[100] and third, Coleman took the opportunity to also file an updated Line of Credit Claim, Claim No. 18-2, to assert the claim in the amount of $5,926,010.33 in principal, plus $2,256,822.28 in accrued interest, as of February 1, 2019.[101]

At trial, Mr. Scott testified that, as of August 8, 2019, the outstanding balance of the Equipment Loan was $1,527,983.96, comprised of $1,119,402.17 in principal and $408,581.79 in accrued interest, with default interest (at 18.0% per annum) continuing to accrue from and after August 8, 2019, at a rate of $559.70 per diem.[102] Mr. Scott further testified that, as of August 8, 2019, the outstanding balance of the Line of Credit Loan was $8,739,877.58, comprised of $5,926,010.33 in principal and $2,813,867.25 in accrued interest, with default interest (at 18.0% per annum) continuing to accrue from and after August 8, 2019, at a rate of $2,963.01 per diem.

## DISCUSSION

In the Complaint, Coleman has asserted nine different counts against Mr. Boyd. First, it asserts guaranty claims (Count IX), requesting judgment against Mr. Boyd for amounts owed

---

[99] *See* Bankruptcy Case Claim No. 17-2.

[100] *See* Bankruptcy Case Claim No. 16-2; *see also* Jt. Tr. Exh. 1 (copy of Claim No. 16-2).

[101] *See* Bankruptcy Case Claim No. 18-2; *see also* Jt. Tr. Exh. 3 (copy of Claim No. 18-2).

[102] Since the time of trial, Coleman has further amended the claim with Claim No. 16-3 to reflect that Coleman collected an additional $874.61 on September 17, 2020, from the liquidation of collateral securing the Equipment Loan. *See* Bankruptcy Case Claim No. 16-3.

pursuant to the Guaranty Agreement in relation to the Line of Credit and Equipment Loan. Second, Coleman has asserted five different claims against Mr. Boyd under section 727 of the Bankruptcy Code (Counts IV-VIII) to object to the discharge of any debts owed by Mr. Boyd, including the Guaranty Claims and any other debt owed to Coleman under the Guaranty Agreement. Finally, Coleman has asserted three different claims against Mr. Boyd under section 523 of the Bankruptcy Code (Counts I-III) to object to the dischargeability of the Guaranty Claims and any other debt owed by Mr. Boyd to Coleman under the Guaranty Agreement. Each of these categories of claims is considered in turn.

## A.    *The Guaranty Claims*

Under Texas law, to recover pursuant to a guaranty, the holder of the guaranty must come forward with "proof of (1) the existence and ownership of the guaranty contract, (2) the terms of the underlying contract by the holder, (3) the occurrence of the conditions upon which liability is based, and (4) the failure or refusal to perform the promise by the guarantor."[103] Such proof must be established by a preponderance of the evidence. Here, without any real challenge by Mr. Boyd, Coleman has successfully established each of these elements.

First, Coleman has provided proof of the guaranty contract – the Guaranty Agreement – and of its ownership by Coleman as the contract counterparty and promisee.[104]

Second, with respect to the terms of the Guaranty Agreement, Mr. Boyd "absolutely and unconditionally guarantee[d] full and punctual payment and satisfaction of the Indebtedness of Borrower [Erath Iron] to Lender [Coleman], and the performance and discharge of all Borrower's

---

[103] *Haggard v. Bank of the Ozarks, Inc.*, 668 F.3d 196, 199 (5th Cir. 2012) (quoting *Marshall v. Ford Motor Co.*, 878 S.W.2d 629, 631 (Tex. App. – Dallas 1994, no writ)).

[104] *See* Jt. Tr. Exh. 10, at pp.31-34 (Guaranty Agreement).

obligations under the Note and the Related Documents."[105]   In relation to such provision,
"Indebtedness" is defined as "all of the principal amount outstanding from time to time and at any
one or more times, accrued unpaid interest thereon and all collection costs and legal expenses
related thereto permitted by law, [including] Lender's reasonable attorney's fees, arising from any
and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising
or acquired, that Borrower … owes or will owe Lender."[106]   "Note" is defined as "all of Borrower's
promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of
Lender, together with all renewals of, extensions of, modifications of, refinancings of,
consolidations of and substitutions for promissory notes or credit agreements."[107]   "Related
Documents" is defined as "all promissory notes, credit agreements, loan agreements,
environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security
deeds, collateral mortgages, and all other instruments, agreements and documents, whether now
or hereafter existing, executed in connection with the Indebtedness."[108]   Thus, pursuant to the
Guaranty Agreement, Mr. Boyd absolutely and unconditionally guaranteed the full and punctual
payment and satisfaction of all outstanding principal and accrued interest owing under the Line of
Credit and Equipment Loan.  Mr. Boyd further agreed under the terms of the Guaranty Agreement
to pay all of Coleman's costs and expenses, including reasonable attorney's fees and legal expenses
incurred in connection with the enforcement of the Guaranty Agreement.[109]

Third, with respect to the conditions upon which Mr. Boyd's liability is triggered under the
Guaranty Agreement, the agreement makes clear that Mr. Boyd's promise is a "guaranty of

---

[105] *Id.,* at p.31.

[106] *Id.*

[107] *Id*. at p.33.

[108] *Id*.

[109] *See id*., at p.32 ("Attorneys' Fees; Expenses" provision of "Miscellaneous Provisions" of Commercial Guaranty).

payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness…."[110]   Here, it is undisputed that all indebtedness incurred under the Line of Credit and Equipment Loan are currently due and owing to Coleman.

Fourth and finally, it is also undisputed that Mr. Boyd has failed to perform under the Guaranty Agreement.

Based upon the foregoing, Coleman has established an entitlement to judgment against Mr. Boyd under the terms of the Guaranty Agreement for the following amounts: (1) all amounts owing under the Line of Credit – namely, $8,739,877.58 plus continuing prejudgment interest on the unpaid principal amount of the loan at the rate of 18.0% per annum (equating to roughly $2,963.01 per diem) from and after August 8, 2019, through the date of the entry of judgment; *plus* (2) all amounts owing under the Equipment Loan – namely, $1,527,983.96 plus continuing prejudgment interest on the unpaid principal amount of the loan at the rate of 18.0% per annum (equating to roughly $559.70 per diem) from and after August 8, 2019, through the date of the entry of judgment, less $874.61 on account of the amount collected on September 17, 2020, from the liquidation of collateral; *plus* (3) any reasonable attorney's fees and expenses  that may hereafter be awarded in accordance with Rule 54 of the Federal Rules of Civil Procedure.[111]

---

[110] *Id.*

[111] Coleman has requested an award of attorneys' fees in connection with the Guaranty Agreement claim.  *See* Complaint, at p.56 (prayer for relief).  Because the request is to be made by *post-judgment* motion in accordance with Rule 54(d)(2) of the Federal Rules of Civil Procedure (made applicable to adversary proceedings pursuant to Rule 7054(b)(2)(A) of the Federal Rules of Bankruptcy Procedure), it is not considered further herein.  *See* Fed. R. Civ. P. 54(d)(2); Fed. R. Bankr. P. 7054(b)(2)(A).

**B.      *Objections to Discharge***

The federal bankruptcy system is designed to provide the honest but unfortunate debtor with the opportunity to obtain a fresh financial start.[112]  As framed by the Supreme Court, "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[113]  The fresh financial start contemplated by the Bankruptcy Code is effectuated through a discharge of indebtedness.  In chapter 7, the discharge is provided by section 727 of the Bankruptcy Code.[114]

Importantly, the bankruptcy system is designed for *honest* debtors – those who have not engaged in fraudulent conduct leading up to the pursuit of discharge relief and those who do not engage in fraudulent conduct during the course of the case.  As such, discharge relief is dependent upon a debtor's complete, truthful and timely disclosure of financial information – information with respect to, among other things, the debtor's assets, liabilities, and financial affairs.  It is for these reasons that some have described the discharge in bankruptcy as a privilege reserved for only those debtors who engage in the bankruptcy process in an honest, forthright and timely manner.[115]  For those who fail or refuse to do so, the Bankruptcy Code sets out a number of grounds for the denial of a discharge.[116]

---

[112] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

[113] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[114] *See* 11 U.S.C. § 727(a); *see also id*. § 524(a) (provision giving effect to discharge).

[115] *See In re Tabibian*, 289 F.2d 793, 795 (2nd Cir. 1961) ("a discharge is a privilege granted the honest debtor and not a right accorded to all bankrupts"); *see also United States v. Johnston*, 267 B.R. 717, 722-23 (N.D. Tex. 2001), *aff'd*, 48 Fed. Appx. 917 (5th Cir. 2002).

[116] *See* 11 U.S.C. § 727(a)(2)-(a)(7) (grounds for the denial of a discharge in chapter 7).

In this case, Coleman has objected to Mr. Boyd's discharge under sections 727(a)(2)(A), (a)(3), (a)(4), (a)(5), and (a)(7) of the Bankruptcy Code.  Each of the objections is considered in turn.

### 1.    *Objection Pursuant to Section 727(a)(2)(A)*

As relevant to this case, section 727(a)(2)(A) of the Bankruptcy Code provides for the denial of a chapter 7 discharge to a debtor if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred … or concealed … property of the debtor, within one year before the date of the filing of the petition."[117]  Based upon such statutory language, to successfully secure the denial of a debtor's discharge under § 727(a)(2)(A), a creditor must establish the following four elements: "(1) a transfer [or concealment] of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; [and] (4) with intent to hinder, delay, or defraud a creditor or officer of the estate."[118]  As to the last element, the level of intent that must be shown is actual intent, as opposed to constructive intent.[119]  Coleman bears the burden of proving each of these elements by a preponderance of the evidence.[120]  Mr. Boyd denies any improper conduct.

*Fraudulent Transfer Analysis.*  Pursuant to the Complaint, Coleman asserts that "the transfer of assets pledged as collateral to Coleman from Erath Iron to third parties, the failure to comply with the [Coleman TRO], the continued operation of Erath Iron and the diversions of proceeds of the sale of assets defrauded Coleman"; therefore, according to Coleman, Mr. Boyd's

---

[117] *Id*. § 727(a)(2)(A).

[118] *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005) (quoting *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989)).

[119] *Pratt*, 411 F.3d at 565 (citing *Chastant*, 873 F.2d at 91); *see also Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 698 (5th Cir. 2009).

[120] *See Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003) (citing *Chastant*, 873 F.2d at 90-91).

discharge should be denied under § 727(a)(2) because Mr. Boyd hindered, delayed and/or defrauded Coleman in the collection of its collateral.[121]  Importantly, the second element of a § 727(a)(2)(A) objection requires that the property at issue be property belonging to the debtor. Here, Coleman's focus in the Complaint is on the transfer of *Erath Iron* property, not property of Mr. Boyd.  As a result, Coleman has failed to present a viable objection under § 727(a)(2)(A) to the extent the objection is predicated upon the fraudulent transfer of property belonging to Mr. Boyd and the § 727(a)(2)(A) objection will be overruled to this extent.

*Fraudulent Concealment Analysis.*  In the case of fraudulent concealment, on the other hand, Coleman has persuasively brought to light the scheme by which Mr. Boyd diverted hundreds of thousands of dollars away from Erath Iron and into his own hands that he then fraudulently concealed from Coleman under the guise of fictitious Erath Iron business expenses.  In particular, in the face of heightened scrutiny during the 2015 Line of Credit renewal, Mr. Boyd convinced Mr. Scott that he was working on a large demolition project in south Texas that would result in Erath Iron's eventual acquisition of a substantial amount of new scrap metal inventory.  The existence of the project and, more specifically, the contemplated increase to Coleman's collateral base, was material to Coleman's decision to renew the line in 2015.  In reality, however, no such south Texas project existed.

During the one-year period preceding the Petition Date, Mr. Boyd made upwards of $370,000 in Disguised Dividend cash withdrawals from the cash drawers of Erath Iron.  To conceal his receipt, retention, and personal use of such funds, Mr. Boyd instructed the withdrawals to be booked as scrap metal purchases in the ScrapTrax system using the dummy purchaser name RJ

---

[121] *See* Complaint, ¶¶ 173-174.

Machine.[122]  Then, the ScrapTrax transactions were recorded and reported to Coleman in Erath Iron's financial statements as Erath Iron business expenses instead of as dividends to Mr. Boyd, as an equity owner.

At trial, Mr. Boyd claimed that certain of these withdrawals could not have been made by him or for his own use – namely, $13,232.60 in withdrawals made while Mr. Boyd was allegedly out of state, a $3,436 withdrawal for a kids' baseball team/league, and $53,691 in withdrawals made after Mr. Boyd repositioned his primary workplace from the Stephenville yard to the Alvarado yard.[123]  While the Court has serious doubts about the truthfulness of Mr. Boyd's assertions, even if they are treated as accurate that still leaves roughly $300,000 in concealed Disguised Dividends.  And at least with respect to the amount of the Disguised Dividends withdrawn under the guise of the south Texas demolition job, Mr. Boyd fraudulently concealed the acquisition, retention, and use of such funds in order to both further the individual interests of himself and Ms. Murphy and to perpetuate the Erath Iron lending relationship so as to maintain the means by which he could continue to funnel monies away from Earth Iron and towards his own use for his second family with Ms. Murphy – thereby hindering, delaying and defrauding Coleman in its collection rights.

Accordingly, to the extent Coleman's § 727(a)(2)(A) objection is predicated upon fraudulent concealment, the objection will be sustained for the reasons set forth above.

### 2.    *Objection Pursuant to Section 727(a)(3)*

As relevant to this case, section 727(a)(3) of the Bankruptcy Code provides for the denial of a chapter 7 discharge to a debtor who has "failed to keep or preserve any recorded information,

---

[122] *See* Jt. Tr. Exhs. 137 and 150.

[123] *See* Jt. Tr. Exh. 150.

including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such … failure to act was justified under all of the circumstances of the case."[124]  Based upon such statutory language, to successfully secure the denial of a debtor's discharge under § 727(a)(3), a creditor must satisfy the initial burden of proving by a preponderance of the evidence that (1) the debtor failed to keep or preserve adequate financial books or records and (2) such failure makes it impossible to ascertain the debtor's financial condition.[125]  Once this initial burden is satisfied, the burden shifts to the debtor to prove by a preponderance of the evidence that the inadequacy is "justified under all the circumstances."[126]

Pursuant to the Complaint, Coleman asserts that Mr. Boyd failed to keep sufficient records to explain the disposition of assets that he acquired prepetition, including the $635,632.72 in income that he acknowledged receiving within the fourteen months preceding his bankruptcy filing.[127]  Mr. Boyd disputes having failed to keep sufficient records, but to the extent of any failure, he asserts it is excusable because Mrs. Boyd handled the Boyds' financial record-keeping and she allegedly became hostile and antagonistic towards Mr. Boyd following their separation.

*Failure to Keep Sufficient Financial Records*.  As indicated above, Coleman's primary focus is on the disposition of income received prior to the Petition Date, particularly between January 1, 2016, and the Petition Date.  Such record-keeping was and is material to Coleman because Coleman is dependent upon Mr. Boyd, as a guarantor, for any further recovery on the unpaid balance of the Erath Iron loans.  Thus, Coleman requires adequate information in order to assess whether any use or transfer of the funds may be avoidable and recoverable for the benefit

---

[124] 11 U.S.C. § 727(a)(3).

[125] *See Duncan*, 562 F.3d at 697; *Dennis*, 330 F.3d at 703.

[126] *See Duncan*, 562 F.3d at 697; *Dennis*, 330 F.3d at 703.

[127] *See* Complaint, ¶ 178.

of creditors, including Coleman.  In terms of magnitude, Coleman highlights both the $635,632.72 in wages and distributions that Mr. Boyd acknowledges he received within the fourteen months preceding his bankruptcy filing,[128] but also the more than $300,000 in Disguised Dividends withdrawn from the cash drawers, including the significant amount of funds secreted away from Erath Iron under the pretext of the south Texas demolition job, as discussed above.

In relation to such income, Mr. Boyd initially attempts to downplay expectations with respect to the extent and nature of record-keeping required of him by highlighting his educational level (*i.e.*, having not completed college) and emphasizing that Mrs. Boyd was the one who handled the Boyds' finances.  In the former case, Mr. Boyd attempts to portray himself as a simple blue-collar worker lacking sufficient educational training to know much about business and personal finances and the record-keeping requirements associated with both.  In the latter case, because Mrs. Boyd was the one who obtained her MBA, she is the one who the Boyds designated to handle most of the Boyds' day-to-day financial matters, including, for example, the deposit of Mr. Boyd's paychecks into the Boyds' joint checking account until around mid-2016.

"The adequacy of the debtor's records is determined on a case by case basis, using such considerations as the 'debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice.'"[129] In other words, "[s]ection 727(a)(3) is not a prescription of a 'rigid standard of perfection' in record-keeping, but requires that the debtor 'present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business

---

[128] *See* Filed SOFA, at p.2 (responses to Questions 4 and 5).

[129] *Duncan*, 562 F.3d at 697 (quoting *Pher Partners v. Womble* (*In re Womble*), 289 B.R. 836, 856 (Bankr. N.D. Tex.), *aff'd*, 299 B.R. 810 (N.D. Tex. 2003), *aff'd*, 108 Fed. Appx. 993 (5th Cir. 2004)).

transactions for a reasonable period in the past.'"[130]  With this in mind, and focusing on Mr. Boyd's formal education level, while it is true that Mr. Boyd did not complete his undergraduate degree and does not have an accounting or business degree or any specific accounting experience per se, it cannot be ignored that Mr. Boyd was the one who, for over a decade, was directly involved with, and exercised the oversight of, the day-to-day business transactions that took place at Erath Iron's scrapyard in Stephenville, had the final say on all business decisions involving Erath Iron – a multi-location, multi-million dollar business – and was the ultimate decision-maker for all of the other Boyd-owned businesses within the Boyd business enterprise.  Thus, the Court finds unconvincing Mr. Boyd's attempt to use his educational background as a means to downplay his level of business savviness and sophistication.  Instead, based upon Mr. Boyd's experience and the breadth of the Boyd business enterprise, the Court finds that Mr. Boyd is and was a sophisticated businessman with knowledge of the necessity and importance of obtaining and maintaining business and personal financial records.

With respect to the Boyds' designation of Mrs. Boyd as the one to handle the Boyds' financial affairs, on the other hand, Mr. Boyd's argument has greater merit – but only with respect to those financial matters of which Mrs. Boyd was informed.  The caveat is of particular significance in this case.  For example, while it is true that Mrs. Boyd handled the deposit of Mr. Boyd's paychecks into the Boyds' joint checking account until around mid-2016, that does not thereby translate into Mrs. Boyd's supposed knowledge of, and compilation of records with respect to, what happened to the funds thereafter (as suggested by Mr. Boyd).  Instead, because the Boyds' bank accounts were *joint* accounts, Mr. Boyd had an equal ability to unilaterally dispose of his

---

[130] *Neary v. Hughes* (*In re Hughes*), 353 B.R. 486, 499 (Bankr. N.D. Tex. 2006) (quoting *First Nat'l Bank of Claude, Tex. v. Williams* (*In re Williams*), 62 B.R. 590, 593 (Bankr. N.D. Tex. 1986)), *aff'd*, 386 B.R. 624 (N.D. Tex. 2008), *aff'd*, 309 Fed. Appx. 841 (5th Cir. 2009).

earnings after being deposited, and both of the Boyds had the ability to obtain copies of all relevant bank statements and associated records. Even so, bank statements obtained by Coleman only reflect the deposit of roughly $377,000 of the income reported by Mr. Boyd during the period in question, leaving a substantial amount of the income still open to question.[131] Plus, deposited funds of $270,500.98 were later transferred from the Boyd accounts to other, unspecified accounts during the period in question[132] with no further documentation produced to detail for what the funds were used. Moreover, because the Boyds were separated during the roughly fourteen-month period at issue (a period during which Mr. Boyd was living continuously with Ms. Murphy), Mrs. Boyd had no real visibility into how the funds were being used by Mr. Boyd or on what Mr. Boyd was spending them. At a minimum, she had zero visibility into the disposition of the funds that Mr. Boyd was siphoning out of Erath Iron under the pretext of the south Texas demolition job. As to those funds, not only was Mr. Boyd successful in fraudulently misleading Coleman into the belief that the fictitious job existed, he was also successful in fraudulently misleading Mrs. Boyd into such belief.

Ultimately, at trial, Mr. Boyd claimed that all of the income that he received during the fourteen-month period preceding his bankruptcy filing was either used for other Boyd businesses or to cover his own regular expenses, such as food, car expenses, daycare for the kids, and the like. In each case, he explained that he simply did not keep receipts for these types of things because he was "not a receipt guy." The Court did not find Mr. Boyd's testimony credible. In relation to the assertion that funds were used for other Boyd businesses, Mr. Boyd, himself, verified otherwise in

---

[131] *See* Jt. Tr. Exhs. 134 and 135.

[132] *See id.*

his responses to Questions 7, 8, and 18 of the Filed SOFA, wherein he confirmed that there were no such transfers to or for the benefit of any such entities.[133]

In relation to personal expenses, for the period after September 2, 2016, when Mr. Boyd controlled all of his own financial affairs (including the disposition of his paychecks), Mr. Boyd provided no receipts, only 20 pages in Pinnacle Bank statements,[134] 43 pages of check records and credit card records produced by Murphy,[135] and 49 pages related to the ownership of his entities.[136] Collectively, these records only account for a small amount of the funds at issue. For example, only $6,018.05 was spent out of Mr. Boyd's Pinnacle account prior to the Petition Date.[137] And while Ms. Murphy's credit card records evidence an additional roughly $58,000 in spending prior to Mr. Boyd's bankruptcy filing,[138] those records are not marked in a way where a creditor can determine which purchases were attributable to Mr. Boyd as opposed to Ms. Murphy. Even assuming Mr. Boyd paid for every expense shown in Ms. Murphy's credit card records, the Pinnacle bank records and Murphy credit card billings only account for a total of roughly $64,000 prior to the Petition Date.

Moreover, Mr. Boyd knowingly elected to impair the ability of Coleman (and the Court) to otherwise evaluate the magnitude of Mr. Boyd's average monthly spending by claiming in his filed Schedule J that he had no regular monthly expenses *at all* as of the Petition Date.[139] Mr. Boyd instead testified that all relevant expenses constituted the expenses of Ms. Murphy.

---

[133] *See* Filed SOFA, at pp.3 and 6 (responses to Questions 7, 8 and 18).

[134] Jt. Tr. Exh. 14.

[135] Jt. Tr. Exh. 104.

[136] Jt. Tr. Exh. 15.

[137] Jt. Tr. Exh. 14.

[138] *See* Jt. Tr. Exh. 104.

[139] *See* Filed Schedules (Schedule J).

"The debtor's records must at least reasonably allow for reconstruction of the debtor's financial condition to meet the requirements of the Code."[140]  For the reasons set forth above, the Court finds that Coleman successfully met its initial burden of proving that Mr. Boyd failed to keep and preserve financial records with respect to the disposition of income that he received within the fourteen-month period preceding his bankruptcy filing and that such failure has prevented Coleman from being able to adequately reconstruct Mr. Boyd's transactions and ascertain his true financial condition.

*Justification for Inadequacy of Records*.  Turning, then, to the question of whether the failure to keep and preserve such records was justified under all of the circumstances of the case, Mr. Boyd again contends that Mrs. Boyd was the one responsible for keeping/making and maintaining his personal records and also that, given the fact that he undertook a great number of his transactions in cash and was not a "receipt guy," it is unreasonable to expect any such record-keeping to exist.  In either case, Mr. Boyd argues that he was not trying to deceive anyone by failing to keep financial records.  The Court is not persuaded by these proffered justifications.

Mr. Boyd is ultimately responsible for keeping and producing records sufficient for his creditors to ascertain his financial condition.  The mere fact that, prior to the fourteen-month period, he relied on Mrs. Boyd to handle their record-keeping does not absolve Mr. Boyd of his own failure to do so.[141]  More importantly, even if the Court were to excuse Mr. Boyd's failure to maintain financial records while Mrs. Boyd was handling the Boyds' finances, Mr. Boyd would still have no justification for his own failure to keep records for the period during which he admits that he was in control of his own finances – *i.e.*, from and after September 2, 2016 – and for the

---

[140] *Martin Marietta Materials Sw., Inc. v. Lee* (*In re Lee*), 309 B.R. 468, 478 (Bankr. W.D. Tex. 2004).

[141] *Guaranty Bank & Trust Co. v. Sanford (In re Sanford)*, 362 B.R. 743, 755 (Bankr. M.D. La. 2007) (denying discharge where a debtor "attempted to deflect all responsibility for maintaining his financial records upon his accountant").

thousands of dollars of fraudulently-obtained funds taken out of Erath Iron under the pretext of the

south Texas demolition job.[142]

Based upon the foregoing, the Court finds that Mr. Boyd has failed to establish by a

preponderance of the evidence that this failure to keep and preserve financial records with respect

to the disposition of income that he received within the fourteen-month period preceding his

bankruptcy filing was justified.

*Conclusion.* For the foregoing reasons, Coleman's objection to Mr. Boyd's discharge

pursuant to § 727(a)(3) will be sustained.

### 3. Objection Pursuant to Section 727(a)(4)

As relevant to this case, section 727(a)(4) of the Bankruptcy Code provides for the denial

of a chapter 7 discharge to a debtor who "knowingly and fraudulently, in or in connection with the

case – (A) made a false oath or account … or (D) withheld from an officer of the estate entitled to

possession under [the Bankruptcy Code], any recorded information, including books, documents,

records, and papers, relating to the debtor's property or financial affairs."[143]

### a. False Oath or Account (§ 727(a)(4)(A))

To prevail on an objection to discharge under § 727(a)(4)(A), the objecting party must

prove by a preponderance of the evidence that: (1) the debtor made a statement under oath in, or

in connection with, the bankruptcy case; (2) the statement was false; (3) the debtor knew the

statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement

---

[142] As to these funds, the Court finds that Mr. Boyd conscientiously failed to maintain records that would enable a
tracing of the use or disposition of such funds. Even so, § 727(a)(3) does not require a showing of wrongful intent in
failing to keep records. *See, e.g., Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002) ("intent to
defraud is not a required element of a § 727(a)(3) violation"); *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R.
429, 440 (S.D.N.Y. 2004) ("A party objecting to discharge under § 727(a)(3) is required to show only that the debtor's
records are not reasonable in light of the circumstances, not that the debtor failed to keep records in order to deceive
his creditors"). Thus, Mr. Boyd's contention that he acted without malice in failing to keep records is irrelevant.

[143] 11 U.S.C. § 727(a)(4)(A) and (D).

was material to the bankruptcy case.[144]  Once the objecting party has established a prima facie case under § 727(a)(4)(A), the burden shifts to the debtor to present evidence that the debtor is innocent of the charged offense.[145]

*False Statements*.  Pursuant to the Complaint, Coleman broadly alleges that Mr. Boyd intentionally failed to be forthcoming with information in the Bankruptcy Case, identifying a litany of examples of alleged misstatements and material omissions in his Filed Original Schedules, Filed Amended Schedules, and Filed SOFA.[146]  "The bankruptcy schedules and statement of financial affairs of a debtor serve a vital role for creditors in a bankruptcy case, in that they ensure that adequate and truthful information is available to trustees and creditors ... without the need for further investigation to determine whether or not the information is true and correct."[147]  Hence, a debtor has "a paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all requests."[148]  Recognizing as much, a false statement or omission made in the Schedules or SOFA is a false oath sufficient to justify the denial of a discharge under § 727(a)(4)(A) of the Bankruptcy Code.[149]

While Mr. Boyd denies having made any material false statements or omissions in his Petition, Schedules and SOFA, Coleman successfully brought to light each of the following false statements and omissions at trial: (i) the false estimated asset and liability figures in the Original Petition; (ii) the false Erath Iron sole proprietorship disclosure in the Amended Petition; (iii) the

---

[144] *Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016); *Duncan*, 562 F.3d at 695; *Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992).

[145] *Duncan*, 562 F3d at 696.

[146] *See* Complaint, ¶¶ 131 and 184; *see also, e.g., id*, ¶¶ 91, 99, 101, 114, 116, 122, 123 and 126.

[147] *Mullen v. Jones (In re Jones)*, 445 B.R. 677, 726–27 (Bankr. N.D. Tex. 2011); *see also Beaubouef*, 966 F.2d at 179.

[148] *Hughes v. Wells (In re Wells)*, 426 B.R. 579, 599 (Bankr. N.D. Tex. 2006) (quoting *Morton v. Dreyer* (*In re Dreyer*), 127 B.R. 587, 593–94 (Bankr. N.D. Tex. 1991)).

[149] *Beaubouef*, 966 F.2d at 178; *Duncan*, 562 F.3d at 695.

incomplete income disclosures in response to Questions 4 and 5 of the SOFA; (iv) the omitted expense disclosures in Schedule J of the Schedules; (v) the inaccurate business interest valuation information included in response to Question 19 of Schedule A/B of the Schedules; (vi) the incomplete disclosure of Mr. Boyd's interest in and value of the Brad Boyd Dynasty Trust in response to Questions 25 and 31 of Schedule A/B of the Schedules; (vii) the omitted disclosure of Mr. Boyd's director position with Spitfire United in response to Question 27 of the SOFA; and (viii) the omitted disclosure of to whom personal financial statements were provided in response to Question 28 of the SOFA.

*Knowledge of Falsity*.  "Knowledge of falsity may be demonstrated by circumstantial evidence, and by direct evidence where the debtor[ ] had knowledge of [his] current and former business affairs."[150]  "The complaining party need not prove that the debtor consciously chose to omit or misstate information, only that the debtor knew the truth when the omission or misstatement was made."[151]

In relation to each of the foregoing false statements and omissions, Mr. Boyd claims that he had no knowledge of any such falsity at the time he made the statements or omissions.  The Court did not find Mr. Boyd to be credible on this point.  The evidence elicited at trial by Coleman clearly demonstrated that Mr. Boyd was well aware of the true state of affairs in relation to each of the above-referenced false statements/omissions highlighted by Coleman.

*Fraudulent Intent*.  An objecting party may prove fraudulent intent by showing either an actual intent to deceive on the part of the debtor or the debtor's reckless indifference to the truth.[152]

---

[150] *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 366 (Bankr. N.D. Tex. 2010).

[151] *Cadle Co. v. Mitchell* (*In re Mitchell*), 102 Fed. Appx. 860, 862 n.1 (5th Cir. 2004) (citing *Sholdra v. Chilmark Fin. LLP* (*In re Sholdra*), 249 F.3d 380, 382 (5th Cir.), *cert. denied*, 534 U.S. 1042 (2001)).

[152] *Packer*, 816 F.3d at 95; *Sholdra*, 249 F.3d at 382.

And while it has been recognized that "a discharge cannot be denied when items are omitted from the schedules by honest mistake,"[153] it has also been recognized that "the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent."[154]   Here, Coleman asserts that, given the nature of the misstatements and omissions, it is clear that Mr. Boyd conscientiously chose to provide false or misleading information (or, alternatively, to omit material information, as applicable) in an effort to obfuscate the true nature of his financial affairs and directly or indirectly frustrate Coleman's collection efforts.  Coleman further asserts that, at a minimum, the number and significance of the misstatements and omissions is sufficient to establish a level of reckless disregard for the truth that implicitly establishes fraudulent intent.

Mr. Boyd, claiming to have misunderstood certain terms with the Petition, Schedules and SOFA and noting that his bankruptcy lawyers were the ones who actually completed the forms for him, asserts that none of the false statements or omissions were made with any intent to mislead his creditors, nor were any of them made with a reckless disregard for the truth.  Indeed, according to Mr. Boyd, he made no real effort to determine the veracity of any of the statements made in his Petition, Schedules and SOFA; he, instead, just signed whatever was laid before him without attempting to determine if any of the statements were true.  In other words, Mr. Boyd attributes the errors and omissions to forgivable mistakes, attempting to shift the blame to his bankruptcy counsel.

Having carefully considered the nature of the false statements and omissions made and the testimony of Mr. Boyd and Mrs. Bower (Mr. Boyd's bankruptcy counsel), including testimony

---

[153] *Beaubouef*, 966 F.2d at 178; *see also Chizk v. Ramon (In re Ramon)*, 433 B.R. 571, 579 n.9 (Bankr. N.D. Tex. 2010) ("it seems certain that more than one error – *i.e.* a pattern – is the minimal requirement").

[154] *Duncan*, 562 F.3d at 695; *see also Crumley*, 428 B.R. at 366–67.

with respect to the efforts undertaken by Mrs. Bower to ensure that Mr. Boyd had sufficient time, resources, and an understanding of the information required and the nature of his sworn oath in signing the Petition, Schedules and SOFA, the Courts finds unconvincing Mr. Boyd's effort to deflect responsibility for his actions and, instead, finds that Coleman has satisfactorily established that Mr. Boyd (with the assistance of Ms. Murphy) undertook a calculated plan to misreport, under-report, and omit material information in order to hinder, delay, and defraud Coleman in its collection efforts.

First, in relation to Mr. Boyd's argument that, because he purportedly made no real effort to determine the veracity of any of the statements included within the Original Petition, Amended Petition, Filed Original Schedules, Filed Amended Schedules, and Filed SOFA, there cannot be a finding of fraudulent intent, not only does the Court find the assertion to be lacking in truthfulness, this level of disregard presents such a clear, unobscured picture of reckless disregard for the truth that it equates to fraudulent intent.[155]   Moreover, because of the large number of false statements and omissions in this case, Mr. Boyd has, himself, successfully rebutted any possibility of honest mistake.   While Mr. Boyd amended his Schedules twice (in each case, again verifying the completeness and accuracy of the information contained therein), he never took steps to correct the erroneous information included in the Amended Petition, the Filed Original Schedules, and the Filed SOFA.   Mr. Boyd's continuing failure to remedy the errors and omissions is a textbook example of the type of reckless disregard for the truth that equates to fraudulent intent.[156]

---

[155] *See First United Bank & Trust Co. v. Buescher (In re Buescher)*, 491 B.R. 419, 433 (Bankr. E.D. Tex. 2013) ("At a minimum, that lack of concern [demonstrated by signing the declaration without reviewing the schedules] rises to the level of a reckless disregard for the truth"), *aff'd*, 783 F.3d 302 (5th Cir. 2015).

[156] *See Beaubouef*, 966 F.2d at 178 (finding the existence of more than one falsehood, coupled with the failure to take advantage of the opportunity to clear up all errors and omissions when filing an amendment, to be sufficient to support a finding of reckless indifference to the truth and, thus, the requisite intent to deceive for purposes of § 727(a)(4)(A)).

Second, Mr. Boyd's attempt to deflect blame to counsel is equally unavailing. "A debtor's reliance on advice of counsel constitutes an excuse for [an error or omission] ... only where his reliance is reasonable and in good faith."[157] "As a matter of law, reliance on advice of counsel is no defense to an action under 11 U.S.C. § 727(a)(4)(A) where [the] debtor has knowingly sworn to false information."[158] Here, Mr. Boyd had knowledge of all the underlying information required to be disclosed, and he knowingly and voluntarily declared under penalty of perjury that (a) he read the Original Petition, Amended Petition, Filed Original Schedules, Filed Amended Schedules, and Filed SOFA, and (b) the information disclosed therein was complete and accurate in all respects. It is neither reasonable nor in good faith to now attempt to shift the blame to counsel. Mr. Boyd "must accept responsibility for the information in [his] statements and schedules."[159]

Based upon the foregoing, the Court finds that Coleman has proven by a preponderance of the evidence that all of the above-described false statements and omissions in the Original Petition, Amended Petition, Filed Original Schedules, Filed Amended Schedules, and Filed SOFA were made by Mr. Boyd with fraudulent intent.

*Materiality*. Finally, the Court must consider whether the false statements and omissions were material to the Bankruptcy Case. "The subject matter of a false oath is 'material' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[160] Importantly, as evidenced by the foregoing quote, the materiality at issue is the

---

[157] *Dreyer*, 127 B.R. at 597.

[158] *Casciato–Northrup v. Blow (In re Blow)*, Adversary No. 06-3358, 2007 WL 1858697, at *4 (Bankr. S.D. Tex. June 25, 2007) (citing *Sholdra*, 249 F.3d at 383) ("inexperience with financial affairs or reliance on incorrect advice or information, even if true, cannot withstand summary judgment")).

[159] *Dreyer*, 127 B.R. at 597; *see also Hibernia Nat'l Bank v. Perez*, 124 B.R. 704, 710 (E.D. La. 1991) ("the advice of counsel is not a defense when it is transparently plain" that the information at issue is required to be disclosed in the Schedules or SOFA), *aff'd*, 954 F.2d 1026 (5th Cir. 1992).

[160] *Beaubouef*, 966 F.2d at 178 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)).

relational connection of the statement/omission to the debtor's business transactions or estate as opposed to the value of the subject matter of the statement/omission or whether the statement/omission was in fact detrimental to creditors.[161]

Here, all of the above-referenced false statements and omissions unquestionably have a relationship to Mr. Boyd's business transactions or his estate, or concern the discovery of assets, business dealings, or the existence and disposition of Mr. Boyd's property and, thus, are material for Bankruptcy Code § 727(a)(4)(A) purposes. The Original Petition and Amended Petition statements have a relationship to Mr. Boyd's bankruptcy estate, inasmuch as they disclose information with respect to assets and liabilities of the estate. The income disclosures concern both the discovery of Mr. Boyd's assets and the discovery of the existence and disposition of such assets. The omitted expense disclosures concern both the discovery of Mr. Boyd's business dealings and the disposition of Mr. Boyd's assets. The business interest valuation statements have a relationship to Mr. Boyd's bankruptcy estate. The omitted disclosure of Mr. Boyd's director position with Spitfire United concerns the discovery of Mr. Boyd's business dealings. And the omitted disclosure of to whom personal financial statements were provided concerns both the discovery of assets and the discovery of the existence and disposition of assets.

*Conclusion*. Based upon the foregoing, the Court finds that Mr. Boyd knowingly and fraudulently made a false oath or account in or in connection with his Bankruptcy Case and, therefore, Coleman's objection to Mr. Boyd's discharge pursuant to § 727(a)(4)(A) will be sustained.

---

[161] *See Pratt*, 411 F.3d at 566.

### b. Withholding of Recorded Information (§ 727(a)(4)(D))

To prevail on an objection to discharge under § 727(a)(4)(D), the objecting party must prove by a preponderance of the evidence that: (1) the debtor has or had recorded information relating to the debtor's property or financial affairs (which may include any books, documents, records, or other papers), and (2) the debtor withheld such recorded information from an officer of the estate entitled to possession under the Bankruptcy Code.  For purposes of this provision, the trustee appointed in a chapter 7 case is an officer of the estate entitled to the possession of any such recorded information that is within the debtor's possession, custody, or control as of the date of the commencement of the debtor's bankruptcy case.[162]

Pursuant to the Complaint, Coleman generically asserts that Mr. Boyd "has not been forthcoming with information."[163]  However, no other specifics are provided within the Complaint. At trial, Coleman similarly failed to substantiate the existence of any particular recorded information that Mr. Boyd withheld from the Trustee.  Moreover, the Trustee testified that she was unaware of any such withheld recorded information.  That is not to say that no recorded information was withheld from the Trustee, but rather that Coleman has failed to prove by a preponderance of the evidence that Mr. Boyd withheld from the Trustee any specifically identified recorded information with respect to his property or financial affairs.  Consequently, the Court will overrule Coleman's objection to discharge under § 727(a)(4)(D) of the Bankruptcy Code.

### 4.    Objection Pursuant to Section 727(a)(5)

As relevant to this case, section 727(a)(5) of the Bankruptcy Code provides for the denial of a chapter 7 discharge to a debtor if "the debtor has failed to explain satisfactorily, before

---

[162] *See, e.g.*, 11 U.S.C. § 521(a)(4) (requiring debtor to surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate).

[163] *See* Complaint, ¶ 184.

determination of denial of discharge …, any loss of assets or deficiency of assets to meet the debtor's liabilities."[164]   The plaintiff bears the initial burden of adducing evidence that demonstrates that the debtor formerly owned substantial, identifiable assets that are now unavailable for distribution to creditors.[165]  If such burden is met, the debtor then has the burden of establishing a "satisfactory" explanation for the asset reduction, eliminating speculation regarding the disposition of the assets.[166]   In this regard, the Court's inquiry should be focused on "the credibility of the proffered explanation rather than the propriety of the disposition of the assets, and an explanation need not even be meritorious to be satisfactory."[167]   That said, the debtor's explanation "must consist of more than [a] vague, indefinite, and uncorroborated hodgepodge of financial transactions."[168]

Pursuant to the Complaint, Coleman asserts that Mr. Boyd failed to satisfactorily explain, among other things, the use of income that he received within fourteen months of the Petition Date, including the $635,632.72 in income that he disclosed in the Filed SOFA.[169]  At trial, Coleman also highlighted the additional $300,000+ in Disguised Dividends that Mr. Boyd withdrew from the Erath Iron cash drawers, including the amount of such funds that Mr. Boyd siphoned out of the company under the pretext of the south Texas demolition job.  In relation to such income, Coleman highlighted the fact that Mr. Boyd scheduled, as of the Petition Date, $22.00 in cash, $26.81 on deposit in the Boyds' joint checking account, and an "unknown" amount on deposit in Mr. Boyd's

---

[164] 11 U.S.C. § 727(a)(5).

[165] *First Commercial Fin. Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr. N.D. Ill. 2002).

[166] *First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed)*, 700 F.2d 986, 992–93 (5th Cir. 1983); *Hawley v. Cement Indus., Inc. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir. 1995).

[167] *Crumley*, 428 B.R. at 371 (citing *Neary v. Guillet (In re Guillet)*, 398 B.R. 869, 890 (Bankr. E.D. Tex. 2008)).

[168] *Baum v. Earl Millikin, Inc. (In re Baum)*, 359 F.2d 811, 814 (7th Cir. 1966).

[169] *See* Complaint, ¶ 189.

individual Pinnacle Bank account (claiming to "not handle his finances in this account").[170]  Thus, Coleman satisfied its initial burden of presenting evidence of the substantial amount of income received by Mr. Boyd that, according to Mr. Boyd's disclosures, was no longer available for distribution to creditors as of the Petition Date.

Turning, then, to Mr. Boyd's burden of explaining the reduction, in relation to the income received prior to September 2, 2016, Mr. Boyd primarily just continues to attempt to deflect the question by claiming that his paychecks were handled by Mrs. Boyd.  As for the period between September 2, 2016, and the Petition Date, Mr. Boyd claims that he spent the entirety of his reported $81,251.86 in wages and distributions on living expenses, despite verifying under penalty of perjury to having no ongoing monthly personal expenses as of the Petition Date.[171]  Finally, in relation to the hundreds of thousands of Disguised Dividends withdrawn from the Erath Iron cash drawers, including the thousands of dollars withdrawn under the guise of the fake south Texas demolition project, Mr. Boyd's only real explanation was that they equated to dividends that he used to fund other Boyd business, despite verifying under penalty of perjury to having made no such transfers to or for the benefit of insiders.[172]

In considering these explanations, and putting aside the conflicting verified statements, the records Mr. Boyd provided show that there was at least $183,081.76 in wages and distributions that are unaccounted for – *i.e.*, while the checks were written, there is no indication of where that money ended up.  There was also unaccounted-for spending – *e.g.*, $30,400 was either written out to cash or withdrawn from an ATM from the Boyd checking accounts,[173] $270,500.98 was

---

[170] *See* Jt. Tr. Exh. 50, at p.5 (response to Questions 16, 17 and 18 of final Filed Amended Schedule A/B).

[171] *See* Filed Original Schedules (Schedule J).

[172] *See* Filed SOFA (responses to Questions 7, 8, 13, 14 and 18).

[173] Joint Tr. Exh. 134 (statement dated January 25, 2016, through statement dated September 26, 2016); Joint Tr. Exh 135 (statement dated January 25, 2016, through statement dated September 26, 2016).

transferred from the Boyd checking accounts at Texas Bank to other, unidentified accounts,[174] and

at least $17,025.14 in cash spending is unaccounted for after Mr. Boyd took over his own

finances.[175]  Thus, there is at least $501,007.88 in funds that Mr. Boyd, himself, recognizes he

received in the fourteen months before filing for which Mr. Boyd has provided no explanation, has

generically claimed to have used to pay expenses of Boyd entities, or has claimed to have spent on

individual living expenses for which he kept no receipts.  And that is before turning to the

Disguised Dividends, including those related to the purported south Texas demolition project.  Mr.

Boyd cannot overcome a § 727(a)(5) objection with such meager, general explanations with no

supporting documentation.  When substantial assets have been dissipated to the detriment of the

estate and creditors, a debtor must produce supporting documentary evidence.[176]  In short, Mr.

Boyd has failed to meet his burden of presenting a satisfactory explanation for the prepetition

dissipation of his income.

Based upon the foregoing, the Court finds that Mr. Boyd failed to explain satisfactorily the

dissipation of his prepetition income and, therefore, Coleman's objection to Mr. Boyd's discharge

pursuant to § 727(a)(5) will be sustained.

### 5.    *Objections Pursuant to Section 727(a)(7)*

Finally, as relevant to this case, section 727(a)(7) of the Bankruptcy Code provides for the

denial of a chapter 7 discharge to a debtor if, on or within one year of the filing of the petition, the

debtor has committed any act specified in § 727(a)(3) or § 727(a)(5) in connection with another

case under the Bankruptcy Code concerning an insider.[177]  Coleman bears the burden of proving

---

[174] *Id.*

[175] *See generally* Joint Tr. Exhs. 14, 45, 104–05.

[176] *Tow v. Henley (In re Henley)*, 480 B.R. 708, 787 (Bankr. S.D. Tex. 2012) (citing *Chalik*, 748 F.2d at 619–20).

[177] *See* 11 U.S.C. § 727(a)(7).

each of the applicable elements under § 727(a)(7), as well as § 727(a)(3) or § 727(a)(5) as applicable to an insider debtor, by a preponderance of the evidence.[178]

For purposes of § 727(a)(7), an "insider" includes a corporation of which the debtor is a director, officer, or person in control.[179]  In this regard, at all relevant times Erath Iron was an insider of Mr. Boyd given Mr. Boyd's officer and director positions with the company.  It is also undisputed that Erath Iron filed its own bankruptcy case under the Bankruptcy Code. Consequently, that leaves only the question of whether Mr. Boyd, within one year of the Petition Date, undertook any act specified in § 727(a)(3) or § 727(a)(5) in relation to Erath Iron.

As to such inquiry, Coleman provides little guidance within the Complaint as to the specific grounds for the objection.  While the relevant portion of the Complaint dedicated to the § 727(a)(7) objection generically incorporates all other paragraphs of the Complaint by reference,[180] the only independent statement included within the § 727(a)(7) count is that "[i]in the related Erath Iron cases [sic], Brad Boyd should be considered to be in violation of § 727(a)(3) and (5)."[181] Additionally, Coleman offers no elaboration within the parties' Pretrial Order.[182]  Thus, while the Court is not obligated to peruse the Complaint in an effort to discern to what exactly Coleman is referring, the following aspects of the Complaint's allegations are considered in the context of Coleman's § 727(a)(7) objection.

### a. Application of § 727(a)(3) to Erath Bankruptcy Case

First, in relation to § 727(a)(3)'s application to the Erath Bankruptcy Case, Mr. Boyd may be denied a discharge if he "failed to keep or preserve any recorded information, including books,

---

[178] *See Hinsley v. Boudloche (In re Hinsley)*, 149 F.3d 1179, 1998 WL 414302, at *18 n.18 (5ᵗʰ Cir. Jul. 15, 1998).

[179] *See id*. § 101(31)(A)(iv).

[180] *See* Complaint, ¶ 192.

[181] *Id*., ¶ 194.

[182] *See* Docket No. 82, at pp.2-3 (Summary of Plaintiff's Claims).

documents, records, and papers, from which [Erath Iron's] financial condition or business transactions might be ascertained, unless such … failure to act was justified under all of the circumstances of the case."[183]

With this in mind, in describing the alleged "transgressions of the related Debtor, Erath Iron," Coleman alleges in the Complaint, among other things, that "questionable transactions with suspected insiders and affiliates include payments that may not have been identified due to the lack of available records."[184]  At trial, among the payments highlighted by Coleman were the Disguised Dividends obtained by Mr. Boyd from the cash drawers of Erath Iron.  While Mr. Boyd claims to have done nothing impermissible in obtaining dividend payments from Erath Iron, and again points to Mrs. Boyd as the one responsible for all of the record-keeping of Erath Iron, at a minimum it is clear that Mr. Boyd was the sole source of information with respect to the Disguised Dividends taken from Erath Iron under the pretext of the south Texas demolition job and that Mr. Boyd failed to keep and preserve any recorded information with respect to the amount and ultimate disposition of such funds.  It is equally clear that Mr. Boyd's reliance upon Mrs. Boyd's record-keeping role with Erath Iron as the purported justification for Mr. Boyd's failure to keep and preserve such records lacks merit, inasmuch as Mr. Boyd successfully kept Mrs. Boyd in the dark when it came to the Disguised Dividends siphoned out of Erath Iron under the guise of the south Texas job.

As a result, Coleman's objection to Mr. Boyd's discharge pursuant to § 727(a)(7) of the Bankruptcy Code, insofar as predicated upon application of § 727(a)(3) to the Erath Bankruptcy Case, will be sustained.

---

[183] *See* 11 U.S.C. § 727(a)(3) (with the insertion of Erath Iron as the relevant debtor for purposes of § 727(a)(7)).

[184] *See* Complaint, ¶¶ 143-144.

### b. Application of § 727(a)(5) to Erath Bankruptcy Case

Next, in relation to § 727(a)(5)'s application to the Erath Bankruptcy Case, Mr. Boyd may be denied a discharge if Erath Iron, while under the control and/or at the direction of Mr. Boyd, "has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet [Erath Iron's] liabilities."[185]

With this in mind, Mr. Boyd claims to have had no involvement with the Erath Bankruptcy Case and Coleman fails to claim otherwise within the Complaint.   Indeed, at trial, Coleman successfully established that Mr. Boyd abdicated all responsibility and further involvement with Erath Iron after he filed for bankruptcy protection.   Thus, because Coleman has failed to present any evidence of Mr. Boyd's involvement in any disclosures, interviews, depositions, or other explanatory functions on behalf of Erath Iron in connection with the Erath Bankruptcy Case, Coleman has failed to establish that Erath Iron, while under the control and/or at the direction of Mr. Boyd, failed to explain satisfactorily the loss of any assets of Erath Iron or the deficiency of Erath Iron assets to meet Erath Iron's liabilities.

Consequently, Coleman's objection to Mr. Boyd's discharge pursuant to § 727(a)(7) of the Bankruptcy Code, insofar as predicated upon application of § 727(a)(5) to the Erath Bankruptcy Case, will be overruled.

### C.     The Non-Dischargeability Claims

Finally, Coleman has requested a determination of nondischargeability of all debt owed by Mr. Boyd to Coleman pursuant to section 523 of the Bankruptcy Code.   Because the Court has already determined that Mr. Boyd's discharge must be denied pursuant to § 727, it is unnecessary

---

[185] *See* 11 U.S.C. § 727(a)(5) (with the insertion of Erath Iron as the relevant debtor for purposes of § 727(a)(7)).

for the Court to consider Coleman's separately pled § 523 counts.[186]  Therefore, such claims will be dispensed with as moot.

## *CONCLUSION*

Based upon the foregoing, and in summary, the Court finds and concludes as follows:

(a) in relation to Coleman's guaranty claims (Count IX), Coleman will be awarded judgment against Mr. Boyd (i) in relation to the Line of Credit, in the amount of $8,739,877.58 plus continuing prejudgment interest on the unpaid principal amount of the loan at the rate of 18.0% per annum (equating to roughly $2,963.01 per diem) from and after August 8, 2019, through the date of the entry of judgment; *plus* (ii) in relation to the Equipment Loan, in the amount of $1,527,983.96 plus continuing prejudgment interest on the unpaid principal amount of the loan at the rate of 18.0% per annum (equating to roughly $559.70 per diem) from and after August 8, 2019, through the date of the entry of judgment, less $874.61 on account of the amount collected on September 17, 2020, from the liquidation of collateral; *plus* (iii) any reasonable attorney's fees and expenses that may hereafter be awarded in accordance with Rule 54 of the Federal Rules of Civil Procedure;

(b) in relation to the Coleman's objections to discharge under 11 U.S.C. § 727 (Counts IV-VIII), Mr. Boyd's chapter 7 discharge will be denied based upon a sustaining of Coleman's objections pursuant to 11 U.S.C. §§ 727(a)(2)(A) (to the extent predicated upon fraudulent concealment), (a)(3), (a)(4)(A), (a)(5), and (a)(7) (to the extent predicated upon application of § 727(a)(3));

(c) in relation to Coleman's non-dischargeability claims under 11 U.S.C. § 523 (Counts I-III), such claims will be dispensed with as moot based upon the denial of Mr. Boyd's chapter 7 discharge; and

(d) all other relief requested by Coleman pursuant to the Complaint will be denied.

The Court will separately issue a judgment in conformity herewith.

### # # #   END OF MEMORANDUM OPINION  # # #

---

[186] *See McClendon v. DeVoll (In re DeVoll)*, 266 B.R. 81, 98 (Bankr. N.D. Tex. 2001) ("If any one ground for a denial of discharge is established, the Court does not need to decide the propriety of any of the other grounds"); *see also Frank v. Ward (In re Ward)*, Adv. Proc. No. 15-3050-BJH, 2017 WL 377947, at *28 (Bankr. N.D. Tex. Jan. 26, 2017), *aff'd*, 585 B.R. 806 (N.D. Tex. 2018), *aff'd*, 978 F.3d 298 (5th Cir. 2020); *Buescher*, 491 B.R. at 440 n.33 (finding a § 523 nondischargeability objection to be moot given the court's sustaining of multiple § 727 objections to discharge).